**Milburn Bridges, Plaintiff-Appellee, v. Ford Motor Company, a Corporation, Cunningham-Limp Company, a Corporation, and Harold S. Alt, d/b/a William S. Alt & Son, Defendants-Appellants.**

Gen. No. 51,672.

First District, Second Division.

December 10, 1968.

26

William H. Symmes, John M. O'Connor, Jr., of Kirkland, Ellis, Hodson, Chaffetz & Masters, of Chicago, for appellant.

James A. Dooley, of Chicago, for appellee.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

This was an action to recover damages for personal injuries sustained by plaintiff when he fell from a steel truss at a construction site. The jury returned a verdict in favor of plaintiff and against all defendants in the amount of $105,000, and judgment was entered thereon. Defendants appeal.

Prior to November 27, 1956, defendant Ford Motor Company (Ford) engaged defendant Cunningham-Limp Company (Cunningham), a building contractor, to erect a plant building upon property owned by Ford in Indianapolis, Indiana. Plaintiff's employer, Crawford Sprinkler Company (Crawford), was engaged as subcontractor to install the fire sprinkling system in the plant and the painting contract was let to defendant William S. Alt & Son (Alt).

General control of the construction work was exercised by Ford, Cunningham and the architect of the building. The evidence reveals that weekly meetings were held, attended by representatives of all subcontractors actively engaged in the construction and also by representatives of Ford, Cunningham and the architect. The purpose of the meetings, which were presided over by the representatives of Ford and Cunningham, was to determine the status and progress of the construction and to generally decide upon what work was to be completed by specified dates. The subcontractors' work was coordinated to avoid interference by one craft with another, and schedules were drawn instructing the subcontractors where and when they were to work. There is further evidence that Ford had safety men at the construction site who would inspect equipment and generally oversee the work being done.

At the time of plaintiff's accident the skeleton, or steel framework, and the roof of the building had been completed. Vertical steel columns supported the roof and the horizontal steel trusses which spanned the building. Four such vertical columns formed a rectangle which was denominated a bay, consisting of 2,000 square feet. The entire building was divided into four large areas, each such area consisting of 100 bays.

Alt was engaged to paint portions of the plant, including the steel trusses, and it was determined the spray method of painting would be employed. Substantial con-

flict exists in the evidence with respect to the manner in which the paint was being applied by Alt. Defendants' witnesses in general testified that the paint was being sprayed in a fine, mist-like spray, from 12 to 18 inches away from the surface being painted. Plaintiff's witnesses, including men from crafts other than Crawford who had been employed in the construction of the building, testified that the paint was being applied in a pencil-lead sized stream which at times would reach 20 to 30 feet from the spray gun nozzle. There is evidence that much of the area in which the painters were working was covered with paint, including tools, etc., on the floor, light bulbs, and the clothing of workmen of other crafts who were in the immediate area being painted. There is evidence that the paint, when applied to a vertical surface, would run down the side of that surface and form a pool or puddle on an adjacent horizontal surface. The top of the puddle would then dry, or "skim" as the workmen referred to the condition, leaving a thick, wet portion of paint underneath, but having the overall appearance of a totally dry area of paint. The foreman of the heating subcontractor testified that he made complaint to Cunningham and Alt of the manner in which the painters were performing their work and further requested that he be advised in advance as to where the painters were to be working so that he could schedule his work and "get the job done."

On the day of plaintiff's accident Alt's men were painting in an east-to-west direction in the building and the Crawford crew with whom plaintiff worked was installing eight-inch sprinkler mains near the inside roof of the building in a north-to-south direction. There is evidence that plaintiff's crew commenced work in a bay which was then unpainted and that Alt's painters later moved into the same bay and began "painting around" the sprinkler crew. There is contrary evidence that an Alt foreman; a short while prior to plaintiff's accident,

witnessed the crew with whom plaintiff was working attempting to set up ladders against freshly painted trusses and cautioned them to work in a different bay due to the fresh paint; this was denied by plaintiff and his foreman and co-workers.

There is evidence that the Crawford crews normally employed devices termed "rolling scaffolds" from which they installed the sprinkler pipe, but that on November 27, 1956, the date of the accident, the floor of the building was covered with building materials, forcing the plaintiff's crew to use the steel trusses, ladders and movable "kickboards" or "catwalks" to install the pipes. The ladders were used for access to the trusses and kickboards from the floor. It appears that the lower lip of the steel trusses had the shape of an inverted "T" and that there was enough space on the horizontal portion of the lip to hold a man's foot. Crawford's men walked on the lip of the trusses to install the pipes, or placed the kickboards on the lips of parallel trusses when they had to work in the center of a bay. Prior to his accident plaintiff was working on a kickboard installing a length of pipe. He attempted to step onto the lower lip of the truss, either to secure an end of pipe or to descend to the ground, when his foot slid on newly painted steel. Plaintiff fell 20 feet to the concrete floor below, sustaining substantial injuries to his head.

Plaintiff's foreman and three other disinterested witnesses, including the deputy sheriff who investigated the accident, testified that shortly after the accident they inspected the area on the steel truss where plaintiff placed his foot and observed a puddle of paint which had skimmed or dried on the surface. The skim had been torn off, exposing the wet paint underneath.

Defendants first maintain that judgment should have been entered for them as a matter of law because plaintiff was guilty of contributory negligence when he

stepped onto the newly painted steel truss and further because defendants committed no wrongful act which caused plaintiff's injuries.

■ It should be noted at the outset that the law of the State of Indiana, the situs of the accident, must govern the substantive rights and obligations of the parties involved. Beers v. Indianapolis Forwarding Co., 43 Ill App2d 303, 308, 193 NE2d 473. Although this action was initially instituted under a dual theory of defendants' violation of the Indiana Dangerous Occupations Act and the Indiana Scaffold Act, the latter theory was abandoned and reference thereto stricken from the pleadings.

Section 20:304 of the Indiana Dangerous Occupations Act (Acts 1911, c 236, § 4, p 597; Burns' Ind Stats Ann, 1964 Repl, c 3) provides in pertinent part:

"It is hereby made the . duty of all owners, contractors, subcontractors, corporations, agents or persons whatsoever engaged in the care, operation, . . . construction, erection, . . . painting, . . . of any building, . . . factory or business of whatsoever kind, or in the erection, repair or operation or management of any machinery, mechanism, or contrivance, . . . or in the manufacture, operation, preparation, transportation, production, marketing or use of any dangerous or other appliance, substance, commodity or article, to see and to require that all metal, wood, . . . all contrivances, and everything whatsoever used therein are carefully selected, inspected and tested, so as to detect and exclude defects and dangerous conditions, and that all scaffolding, staging, hoists, . . . or temporary or permanent structures, machinery, appliances, tools, mechanisms and all contrivances used are amply, adequately and properly constructed, to bear all weight and adapted to perform the services and meet the requirements for which they are designed or used with safety, . . . ;

and, generally it shall be the duty of all owners, managers, operators, contractors, subcontractors, and all other persons having charge of, or responsible for, any work, mechanism, machinery, appliance, building, factory, plant, means, employment or business of whatsoever nature involving risk or danger to employees, or to the public, to use every device, care and precaution which it is practicable and possible to use for the protection and safety of life, limb and health, limited only by the necessity for preserving the reasonable efficiency of such structure, ways, work, plant, building, factory, elevator, cars, engines, machinery, appliances, apparatus, or other devices or materials without regard to additional cost of suitable materials or safety appliances, or safe conditions or operations, the first concern being safety to life, limb and health."

 It is apparent that the Indiana statute is broad enough to impose the duty upon all three defendants to see that no defects in any phase of the construction operations, including the scheduling of the work and the painting of the building, should involve a risk of danger to the men on the job. There is evidence that Ford retained control of the construction work by means of the weekly meetings, setting up of work schedules, and the employment of safety men at the job site. Likewise there is evidence that Cunningham had direct control over the construction operations not only as the general contractor, but also in the participation with Ford in the scheduling of the work on the building. Finally, there is evidence that Alt improperly applied the paint, causing it to form in puddles on surfaces used by men of other crafts in the performance of their duties. Under these circumstances the jury could properly have found all three defendants fall within the purview of the statute and to have breached the respective duties imposed thereby. Although defendants state,

34

without discussion, that the statute did not apply to them inasmuch as they were "independent contractors" whereas the statute applied solely to "employers in charge," whether or not the statute applied to them was a question of fact, on the evidence, for the jury to determine.

■ Plaintiff contends that the obligations imposed by the foregoing statute are absolute, so that liability rests with the party who violates the statute irrespective of the care, or lack thereof, on the part of the injured party. The cases relied upon by plaintiff in this regard are not in point inasmuch as they involve employer-employee situations and an Indiana statute creating absolute liability in those situations. See Gamble v. Lewis, 227 Ind 455, 85 NE2d 629; Larkins v. Kohlmeyer, 229 Ind 391, 98 NE2d 896. On the contrary, it would appear that the Indiana courts by implication, permit such defenses as contributory negligence, assumption of the risk, etc., to bar recovery in actions predicated upon the Indiana Dangerous Occupations Act. See Hagerman Const. Corp. v. Weber, — Ind —, 221 NE2d 901, which reversed — Ind App —, 202 NE2d 758, for the giving of an erroneous instruction on contributory negligence.

■ ■ Nevertheless, the question of plaintiff's contributory negligence was one of fact for the jury, and the record reveals sufficient evidence to warrant the jury in finding plaintiff free from contributory negligence. There is evidence that plaintiff's crew was the first craft in the bay on the day he was injured, and that Alt's painting crew later moved into the same bay, indicating a conflict in the scheduling of the work by Ford and Cunningham. There is evidence that Alt's men were applying the paint in heavy quantities, resulting in the paint forming into puddles on horizontal areas of the steel trusses, and that skimming would occur, thereby creating a potentially dangerous condition. There is evi-

35

dence that plaintiff and his co-workers were required to employ ladders, kickboards and the steel trusses in order to perform the installation of the sprinkler pipes on the day of the accident because rolling scaffolds were not employable due to the building materials scattered about the floor below. There is evidence that a Ford safety man was nearby at a time when the Alt crew was painting 10 to 30 feet from plaintiff's crew. There is evidence that plaintiff's foot came into contact with a puddle of paint, which had dried on top, as he attempted to step onto the truss, causing him to fall. Under the circumstances the jury could reasonably have found that plaintiff's actions did not constitute contributory negligence.

██ Defendants contend that the trial court erred in failing to require plaintiff to submit a jury instruction accompanying mortality tables offered by plaintiff. Defendants maintain it was the duty of plaintiff, not defendants, to submit such an instruction inasmuch as plaintiff offered the mortality tables. In support of their position in this regard defendants rely upon the case of Avance v. Thompson, 387 Ill 77, 55 NE2d 57, and the pocket part comment to IPI 34.04 which deals with jury instructions to be given in cases where mortality tables are offered into evidence. The comment states that the court in Avance "indicated that it was the responsibility of the party offering the tables to accompany the offer with a proper instruction to the jury." A reading of the Avance case, however, reveals no such "indication" on the part of the court. On the contrary, the court in Avance, at pages 84 and 85 of that opinion, after stating that the jury should be carefully instructed in this regard, alluded to the existing rule that a party who fails to request at trial that an instruction be given cannot complain on appeal of the failure to give that instruction. The court then went on to state that failure to give such an instruction would be prejudicial, but that it would

not reverse on such matter alone, and that it was expressing its views in this regard for the benefit of the parties in the case inasmuch as the judgment was being reversed on other grounds and remanded for a new trial. Defendants here failed to request an instruction to accompany the tables offered by plaintiff and cannot now be heard to complain that failure to give such an instruction was error. Ill Rev Stats 1967, c 110, par 67(3); Sesterhenn v. Saxe, 88 Ill App2d 2, 232 NE2d 277.

██ ██ Defendants also contend that the trial court should not have permitted plaintiff to introduce evidence of custom with respect to the application of paint by the spray gun method and the scheduling of work among the various crafts participating in the construction of a building, inasmuch as it was a tactic on the part of the plaintiff to prolong the trial. Both Illinois and Indiana allow the introduction of such evidence where otherwise pertinent to the issues in the case. Darling v. Charleston Hospital, 33 Ill2d 326, 211 NE2d 253; Southern Indiana Ry. Co. v. Davis, 32 Ind App 569, 69 NE 550. The evidence introduced by plaintiff in this respect was germane to his case. Defendants do not contend that the witnesses who testified as to custom were not qualified, nor do they argue in what manner this evidence harmed them other than to state that it was "prejudicial" and "particularly harmful." It should be noted that defendants also introduced substantial evidence of custom and practice in the construction industry. We are of the opinion that the trial court properly allowed plaintiff to introduce this evidence.

 Defendants maintain the trial court erred in giving several plaintiff's instructions to the jury. With respect to Instruction #21, defendants' counsel at trial specifically stated he had no objection to the instruction when it was offered. With regard to Instruction #15 dealing with future pain and suffering, there was evi-

37

dence adduced at trial supporting this instruction. Defendants object to Instruction #3, which deals with circumstantial evidence, on the ground that the evidence conclusively showed plaintiff was injured as a result of his own contributory negligence; the record does not support this position. With respect to Instruction #19, defendants cannot now complain since their objection to the giving of that instruction was general. Irwin v. Omar Bakeries, Inc., 48 Ill App2d 297, 303–304, 198 NE2d 700.

There was no error in giving plaintiff's Instruction #11 inasmuch as it informed the jury that negligence on the part of plaintiff's employer or his coemployees could not be imputed to plaintiff. Southern Indiana Ry. Co. v. Davis, 32 Ind App 569, 69 NE 550.

Defendants challenge Instruction #18 on the ground that it informed the jury that a violation of the Indiana Dangerous Occupations Act was negligence *per se* rather than simply prima facie evidence of negligence. The case was submitted to the jury on the question of plaintiff's contributory negligence and we are of the opinion that defendants were not prejudiced by the giving of this instruction.

Defendants object to plaintiff's Instruction #20 on the ground that it "sought to impose liability for alleged acts which could not, and did not, constitute a cause of action," namely, the improper scheduling of the work, the manner of application and amount of paint which was applied, building materials on the floor, and the like. The instruction finds support in the evidence and, together with the respective duties owed by the defendants, defines the roles played by each defendant and their deviations from the customs in the construction industry. It was not error to give this instruction.

The final point raised by defendants is that the amount of the verdict is excessive; they ask this court to order a remittitur. Plaintiff was a man of 32 years of

age when he fell 20 feet onto a concrete floor. He was knocked unconscious, was barely breathing and had blood running from his eyes, ears and nose. There is evidence that he thereafter suffered prolonged unconsciousness, paralysis of an eye muscle, cerebral contusion, basilar skull fracture, permanent deafness in one ear, permanent brain damage (which one doctor testified plaintiff had adjusted to but not 100%), and prolonged dizziness, forgetfulness and fainting. Plaintiff spent five weeks in the hospital and testified that it was not until some four to six weeks after his release that he was able to remember the circumstances surrounding the accident. He did not return to work until 18 months after the accident, and although he was employed at the time of trial, his duties were simple, such as laying and arranging pipe on the ground and preparing them for the other workmen to install; plaintiff's treating physicians ordered him not to work in high places. Plaintiff's foreman testified that plaintiff was nervous, forgetful and sometimes walked unsteadily. There is sufficient evidence in the record to support the amount of the verdict.

For these reasons the judgment is affirmed.

Judgment affirmed.

McNAMARA and LYONS, JJ., concur.