ROBBERT D. MUSSER, Plaintiff-Appellant, *v.* LIBERTYVILLE REALTY ASSOC., INC., *et al.*, Defendants.—(WILLIAM G. SCHWANDT, d/b/a Schwandt Realty Co., Defendant-Appellee.)

First District (1st Division)   No. 61803

Opinion filed November 22, 1976.

Charles A. Boyle, of Chicago (William J. Harte, Ltd., of counsel), for appellant.

Michael J. Merlo and Pretzel, Stouffer, Nolan & Rooney, Chartered, both of Chicago (Joseph B. Lederleitner, of counsel), for appellee.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff, Robert D. Musser, brought this action to recover damages for injuries incurred on March 2, 1971, in a fall down an unguarded stairway in vacant office space in a building in Libertyville, Illinois. Named as defendants were Libertyville Realty Assoc., Inc. (Libertyville Realty), Northbrook Trust & Savings, as trustee (the holder of the legal title to the premises), the beneficiaries of the trust, Ayars Realty, Inc., Ayars Realty Co. and William G. Schwandt, d/b/a Schwandt Realty Co. (Schwandt Realty). Plaintiff dismissed Northbrook Trust & Savings, as trustee, Ayars Realty, Inc. and Ayars Realty Co.

One of the beneficiaries, Allen B. Ayars, was the manager of the property through Ayars Realty Co. Ayars had given the rental listing to Schwandt Realty, which was located on the same block as the property.

The complaint alleged that the defendants owned, operated, maintained, managed and controlled the building. Libertyville Realty denied the substance of the complaint, as did Schwandt Realty, which moved for summary judgment, which was granted. The motion for summary judgment alleged that Schwandt Realty never had any interest in the ownership, operation, maintenance or control of the building, and was supported by the affidavit of William Schwandt stating that neither he nor Schwandt Realty owned, operated, maintained and controlled the building and that, as a courtesy to Libertyville Realty, Schwandt Realty made available to prospective purchasers a key to the premises, but did not show the premises to plaintiff.

Plaintiff appeals from the order granting summary judgment, contending there was an issue of material fact as to Schwandt's liability. The other defendants are not involved in this appeal.

The record discloses the following:

Plaintiff was looking for office space for his business and had gone to see the property with an agent of Libertyville Realty Assoc., Inc., James Bales. Schwandt Realty gave Bales the key to allow him and Musser to inspect the property on their own.

The office space had three rooms. Access to the second room was through the first, and to the third through the second. The third room was windowless and was dark when Musser and Bales entered it. Bales

crossed the room to turn on a light. At the same time, plaintiff, in the dark, walked toward the center of the room, tripped over rolls of carpeting next to a stairwell and fell down the stairs just as Bales turned on the light. There was no railing around the stairs and a trapdoor that covered the stairs had been propped up and latched in an open position.

Ayars Realty Co. was the managing agent for the beneficiaries of the property. At the time of the accident, the office space in question was vacant but was serviced with heat and electricity. The managing agent paid the gas and electric bills on behalf of the owner. Allen B. Ayars and one of his associates were responsible for inspecting the premises, seeing that they were properly heated and maintained and not occupied by unauthorized persons. Ayars did not generally inspect the premises before showing them. He did not know what the custom is in commercial properties with respect to inspection prior to showing. He is a member of the Evanston-North Shore Board of Realtors, whose regulations do not, to his knowledge, set out the obligations of a realtor who is seeking a tenant.

Prior to March 2, 1971, he had been in that room on many occasions dating back to 1968. He had the opportunity to inspect the premises maybe once every six months, but not on a regular basis. Mr. Olson of his office would go out once in a great while. When the property was leased and there was regular income, they didn't bother about it. The inspection was more of the exterior than of the interior. The last time he (Ayars) inspected the premises prior to March 2, 1971, was sometime in the fall of 1970. The lease of the prior tenant (Larson) was terminated as of December 31, 1970.

Ayars verbally gave Schwandt Realty the right, beginning in the fall of 1970, to show the premises to prospective tenants and also gave them the key to the premises. It was not paid to inspect the building. The only remuneration Schwandt Realty would get would be the real estate broker's commission if the premises were leased. It would receive nothing more either as salary or otherwise. Its commission would be seven percent of the first year's lease. If another broker found a tenant, the commission would be split equally between that broker and Schwandt Realty.

Schwandt Realty was the only broker in Libertyville who had the key, although Ayars and the Christian Science Reading Room (which leased adjoining space) also had keys.

James Bales was a salesman with Libertyville Realty. He learned of the listing of the premises when he saw a for-rent sign in the window of Schwandt Realty. This meant that Schwandt Realty was the rental agent. Bales stated that generally the salesperson who receives a listing for a property makes a personal inspection. Other people who become aware of it later may take it upon themselves to acquaint themselves with the

property when it is convenient. Two weeks to a month before the accident here involved, Bales had shown the premises to a client. When Bales called Schwandt Realty to make arrangements to show the property, he found out how much he had to quote for rental. Bales thought his conversation was with Bliss, a salesman for Schwandt Realty. When Bales showed the premises at that time he was accompanied by Bliss. Bliss pointed out the advantages and disadvantages to the prospective tenant. Bales stayed close to the front door because he had parked in a no-parking zone in front of the premises. He did not go back to the second room when Bliss was there. He did not see Bliss and the prospective tenant go through all the rooms, only the front one. There were no signs of any craftsmen working in or about or any tools or materials.

Bales later learned through Mr. Cmiel, who worked for plaintiff Musser, that Musser was seeking rental space. Bales made arrangements to show the property to Musser on the morning of March 2, 1971. He called the Schwandt office, talking to a girl who said that Bales could show the premises. Musser and Cmiel drove to Bales' office about 3 p.m. Bales went with them to the premises, parking in front of the Schwandt office. The girl gave him the key and told him there was nobody to accompany him. The three of them went into the first room and then into the second room. There was no light in the second room. Musser and Cmiel didn't stay together. The only way into the third room was through the second room. Bales was the first one into the third room. It was totally dark and there was no light switch at the opening between the second and third rooms. Bales saw a crack of light along a door in the far corner of the third room and walked toward it at a kitty-cornered angle to open it to get some light. He discovered later that Musser was also in the third room behind him and was walking toward the middle of the room on a more centrally located path. Cmiel was not in the third room.

Bales had never been in the third room prior to that time. He was not aware that there was a trapdoor opening to a basement. As he reached the back door, he could see the silhouette of a light switch there. At the moment he turned on the light switch, Musser was tripping over carpeting rolled up and stored right at the edge of the trap door. The trapdoor had been propped up and latched in an open position. Musser fell down the open stairwell. Bales had not noticed anything on the floor as he was walking to the door because it was so dark; but he seemed to feel that there was a cardboard box or boards or something like that in there.

Schwandt Realty was notified when the key was returned that there had been an accident. Schwandt called Bales two days after the accident and told him that Schwandt did not manage the property, but just had the key as a rental agent. To Bales this meant that he could cooperate with

Schwandt on a 50-50 basis when it came to collecting the commission.

No work was being done in the building subsequent to August or September of 1970. Gil Mayne, manager of the former tenant Larson, had been given oral permission by Ayars to do some renovating in the building in the early part of 1970. He had made a proposition to re-lease the premises for use as a personal office, but this never materialized in writing. This work would have been done perhaps in July or August of 1970. None of this work, to Ayars' knowledge, was inspected during its progress. Mr. Olson may have looked at it from time to time, but the work ceased in the last part of July, 1970, when Mayne left Larson. Schwandt Realty had no authority to order any work done.

Ayars did not ascertain subsequent to the accident who placed the rolls of carpeting in the room or where they were placed. He didn't know whether they were the carpeting of the former tenant Larson which had been removed. He didn't notice the rolls on his visits in 1970.

Subsequently, Bliss of Schwandt Realty commenced negotiations with Illinois Bell, which rented the premises.

■■ Plaintiff contends that Schwandt Realty's motion for summary judgment should not have been granted because there was a genuine issue of material fact as to Schwandt's liability. However, in our view of this case, the sole issue before this court is whether, under the undisputed facts in the record before us, Schwandt Realty owed a duty to plaintiff. If it did not, then the motion for summary judgment was properly granted. *Barnes v. Washington* (1973), 56 Ill. 2d 22, 305 N.E.2d 535.

In *Fancil v. Q.S.E. Foods, Inc.* (1975), 60 Ill. 2d 552, 328 N.E.2d 538, the court said at pages 554-55:

> "This action is brought on a theory of common law negligence. The complaint alleges the violation of no duty established by statute or ordinance. Necessary to recovery is the existence of a duty or an obligation requiring one to conform to a certain standard of conduct for the protection of another against an unreasonable risk. (*Barnes v. Washington* (1973), 56 Ill. 2d 22, 26.) It is fundamental that there can be no recovery in tort for negligence unless the defendant has breached a duty owed to the plaintiff. (*Boyd v. Racine Currency Exchange, Inc.* (1973), 56 Ill. 2d 95, 97.) The question of duty, the legal obligation imposed upon one for the benefit of another, is a question of law to be determined by the court (*Barnes v. Washington* (1973), 56 Ill. 2d 22, 26; Prosser, Handbook of the Law of Torts sec. 37, at 206 (4th ed. 1971)) because liability for common law negligence is not absolute but rather it is based on fault. * * * "

■■■ In this case, Schwandt Realty was merely the rental agent for the premises. It had no interest in the ownership, operation, maintenance

or control of the premises. It was not paid to inspect the premises; nor had it any duty to do so. The custom and practice of other realtors is not conclusive to establish a duty on its part. (*Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253.) Schwandt Realty had no authority to make or to order repairs. Its authority was strictly limited to showing the premises to prospective tenants, either directly or through other brokers. If it found a tenant, it would receive a full broker's commission or would split the commission with the broker who had secured the tenant. It would receive nothing more. At the time of the injury to plaintiff, it was not even showing the premises; it had merely given the key to Libertyville Realty so that it might show them. The rolls of carpeting over which the plaintiff tripped were not placed there by Schwandt Realty. The record does not show that Schwandt Realty had any knowledge when the trapdoor was opened, who opened it, or for what purpose; nor does it show that Schwandt Realty had any knowledge of how many hours or days the rolls of carpeting were there, nor where exactly they came from, although there is an inference that they belonged to the former tenant. Schwandt Realty's connection with them is too remote to impose a duty on it. Under the facts in the record before us, the trial court correctly granted summary judgment in favor of William G. Schwandt, d/b/a Schwandt Realty Co.

Judgment affirmed.

GOLDBERG, P. J., and SIMON, J., concur.