THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ED P. HART, Defendant-Appellant.

Second District    No. 80-128

Opinion filed September 16, 1980.

Paul E. Gaziano, of Hyer, Remencius, Liebovich & Gaziano, of Rockford, for appellant.

John H. Maville, State's Attorney, of Belvidere (Phyllis J. Perko and Cynthia N. Schneider, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant was charged by information with the offense of reckless conduct which occurred on July 29, 1979. (Ill. Rev. Stat. 1979, ch. 38, par. 12—5.) Motions to suppress statements and to suppress evidence were heard and they were granted and denied, respectively. The defendant was convicted by a jury on January 14, 1980, and his bond was revoked. On February 1, 1980, he was sentenced to the Department of Corrections for 364 days. His appeal was timely filed.

Three issues are raised on appeal: (1) whether the trial court erred in denying defendant's motion to suppress evidence because the arrest of the defendant was warrantless and nonconsensual and there was no probable cause to arrest; (2) whether the trial court erred by sustaining the State's objection to defense counsel's use of an FBI manual in cross-examination of the evidence technician and (3) whether the trial court erred in sentencing defendant for the maximum term and whether the sentence imposed was excessive.

The record disclosed that Belvidere resident Myron Perkins and his wife, Brita, retired to their separate bedrooms a short while before 11 p.m. on the evening of July 29, 1979. Brita was reading, propped up on pillows, in her bed. The headboard was against the windows in the front bedroom which faced the street. Shortly after 11 p.m., four shots were fired through those windows. Two bullets went through the wall opposite the windows and dropped to the floor in the closet; one bullet lodged in the wall and one bullet was later found to have been lodged amongst the clothes in the closet. Myron was awakened by the shots, ran to Brita's room and found her on the floor, shaken but not wounded. She had thought there were children with firecrackers outside the windows. Myron observed the bullet holes through the windows and immediately called the police. The police responded, and several witnesses described the car the offender had been driving as a late model black or dark-colored TransAm Firebird or Camaro. One of the responding officers knew the defendant's son had recently been killed in a three-vehicle accident which also involved the Perkinses. Another police officer and the son of two of the witnesses provided the information that the defendant's son purchased a 1979 black Pontiac TransAm about two weeks before his death. One person at the scene stated that the defendant blamed the Perkinses for his son's death.

Police went to the defendant's house where they observed a black TransAm and a truck parked in the driveway. The TransAm was parked in front of the truck and furthest from the street. The officers felt the hood of the TransAm, and it was warm. One of the officers, Captain Leggett, rang the door bell and knocked on the screen door several times without receiving an answer. He then opened the screen door and knocked on the inside door, which swung partially open and he continued to ring the bell. At that point, the defendant responded to the knocking and ringing, clad only in T-shirt and shorts. The police either asked if they could enter or were simply invited in by the defendant. The defendant then either asked to be allowed to put some pants on or independently decided to do so by calling upstairs to his wife to throw a pair of pants to him. The police read the *Miranda* warnings to the defendant twice and explained them to him also when he said he did not understand. Captain Leggett told the defendant he was under arrest, and asked where his gun was. The defendant replied that it was upstairs, and he led them to a bedroom where he retrieved a gun from beneath a mattress and gave it to the police. Six bullets were unloaded from the gun. With the defendant's permission, the downstairs gun cabinet was searched but no evidence was retrieved therefrom. The defendant then was asked to and did open the car hood and the officers felt the radiator and hoses which were too hot to hold. The officers requested permission to search the car and trunk. The keys were obtained from the defendant's wife in the house and the defendant opened the car and trunk and permitted a search thereof. The defendant's wife permitted Captian Leggett and a third officer who had arrived to re-enter the house and upon inquiry, led the officers upstairs to see defendant's gun cleaning kit in a closet. She then led them into a bedroom, where a wastebasket was found containing empty shell casings and Kleenex or toilet paper which was soaked with oil and black residue. Defendant's wife permitted the officers to take the wastebasket and its contents. The officers then left the house with defendant in custody.

■■ Addressing the first aspect of the first issue, defendant contends his arrest was the result of a warrantless, nonconsensual entry into his house and that the physical evidence resulting therefrom should have been suppressed. Defendant cites the fourth amendment, several United States Supreme Court cases and, most notably, the recent decision in *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371. In *Payton,* the supreme court held that in the absence of exigent circumstances, and notwithstanding probable cause and statutory authority, the fourth amendment prohibits the police from making a warrantless, nonconsensual entry into a suspect's home in order to make a routine felony arrest. By Illinois statute, arrests based on probable cause are permitted anywhere within the jurisdiction of the State absent either a

warrant or consent. (Ill. Rev. Stat. 1979, ch. 38, par. 107—2(c), par. 107—5(c) and (d).) At least two recent Illinois cases, *People v. Bean* (1979), 73 Ill. App. 3d 918 and *People v. Taylor* (1979), 68 Ill. App. 3d 776, considered the question of warrantless, nonconsensual entry into a private dwelling to make an arrest to be unsettled in Illinois. One Illinois case, *People v. Abney* (1978), 58 Ill. App. 3d 54, held similarly to *Payton*, but that holding was seemingly contrary to numerous previous cases which permitted such arrests absent exigent circumstances and even though there was time to get a warrant. (*People v. Johnson* (1970), 45 Ill. 2d 283; *People v. Fisher* (1979), 76 Ill. App. 3d 331; *People v. Bell* (1976), 41 Ill. App. 3d 233; *People v. Ortiz* (1975), 35 Ill. App. 3d 283; *People v. Franklin* (1974), 22 Ill. App. 3d 775.) *Abney* was appealed to the Illinois Supreme Court and that court's opinion was delivered during the pendency of this appeal. The court in *Abney* stated essentially that prior Illinois cases dealing with the issue of warrantless arrests in private dwellings pursuant to sections 107—2(c) and 107—5(c) and (d) (Ill. Rev. Stat. 1979, ch. 38, pars. 107—2(c) and 107—5(c) and (d)) caused the additional requirement of "exigent circumstances" to be judicially engrafted upon the statute which, on its face, requires only probable cause. The court said:

> "Although this court in *Johnson, Sprovieri*[1] and *Barbee*[2] did not use the phrase 'exigent circumstances' and even expressed some doubts about the exigent-circumstances requirement (see, *e.g., People v. Johnson* (1970), 45 Ill. 2d 283, 287-88), it appears that the principles of the exigent-circumstances rule were adopted in those cases and that the requirements of the rule, by virtue of constitutional restrictions, have been judicially engrafted upon the statute. The statute, as construed, is thus in compliance with the constitutional guidelines enunciated in *Payton.*" (*People v. Abney* (1980), 81 Ill. 2d 159, 167-68.)

Accordingly, we view the *Abney* decision not as a statement of new law, but an exposition of what the law is. Without specifically defining "exigent circumstances," the *Abney* opinion set forth an evaluation of the facts in that case which the court considered to be indicative of such circumstances and of the reasonableness of the police action. The court considered that the following factors were worthy of specific mention in connection with the presence of exigent circumstances:

> (1) The recentness of the offense and the need for prompt action (*i.e.*, within the spirit of the "hot pursuit" doctrine);
>
> (2) The fact there is no deliberate or unjustified delay by the officers during which time a warrant could have been obtained, and

---

[1] *People v. Sprovieri* (1969), 43 Ill. 2d 223.
[2] *People v. Barbee* (1966), 35 Ill. 2d 407.

(3) The fact the suspect is armed and exhibited some sign of a violent character.

The court went on to set forth these other factors which suggested that the police acted reasonably:

(1) The existence of a clear showing of probable cause based on reasonably trustworthy information;

(2) The clear identification of the suspect;

(3) The belief that the suspect is in the premises entered, and

(4) The fact the entry made is peaceful.

■■ We believe all three of the factors mentioned in connection with exigent circumstances were present in the case at bar. The offense occurred less than an hour before the police arrived at the defendant's home. There was no deliberate or unjustified delay by the officers in seeking a warrant because between the time of the offense and the officers' arrival at the defendant's home, bits and pieces of information were being gathered and added together until the warmth of the TransAm's hood became the apex of the pyramided facts, all of which stacked up to form the requisite probable cause to arrest the defendant. Due to the nature of the crime, the officers had reason to believe the defendant was armed and violent. Under the exigencies of the situation, we conclude the officers were justified in proceeding to effect the warrantless arrest. We also point out specifically that the police acted reasonably. The arrest, although made at night, was made peacefully and, by our reading of the record, the entry and searches incidental to the arrest were made consensually.

■■ The second aspect of the search issue raised by the defendant—that there was no probable cause to permit a warrantless entry—is without merit. The record disclosed that Officer Snyder knew that the car described by the eyewitnesses was the same or similar to the one owned by Ed Hart's recently deceased son and he conveyed this information to Captain Leggett. Officer White was later informed by a private citizen named Mark Schultz as to that same fact. Captain Leggett was also aware of the defendant's son's death which had occurred only several weeks prior to the incident and involved the Perkinses. The information received from the unidentified person at the scene that the defendant blamed the Perkinses for his son's death added little to the conclusion which likely had already been drawn by the police as the result of their collective knowledge. Based on that knowledge, the police could reasonably have assumed that the defendant held a grudge against the Perkinses and upon proceeding to the defendant's home and finding the TransAm with a warm engine, they had probable cause to arrest the defendant. It has been established in determining the presence of probable cause that the knowledge of one officer is the knowledge of all

(*People v. Donnenfeld* (1978), 62 Ill. App. 3d 991; *People v. Walker* (1977), 45 Ill. App. 3d 627), and that less evidence is needed to establish probable cause than that required for a conviction. *People v. Ross* (1978), 60 Ill. App. 3d 857; *People v. Hinton* (1977), 45 Ill. App. 3d 925.

■■ The defendant next contends the right to confront and cross-examine his accusers was impermissibly curtailed when he was not allowed to use an FBI manual to attack the procedure used in collecting physical evidence, specifically, gunpowder residue from his hands. In primary support thereof, he cites *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, for the proposition that an expert witness may be cross-examined as to the views of recognized authorities which are expressed in treatises and professional periodicals. *Darling* is inapposite to the case at bar, however, since witness Kazakewich was not presented as an expert, but rather as an evidence technician, and he was not asked for an expert opinion on any matter in the case at bar. The FBI manual is neither a treatise nor a professional periodical. Further, the manual was undated and, as suggested by the comments in the record, probably outdated as well. The unreliability of the particular edition of the manual sought to be used by defense counsel was further demonstrated when defense counsel subsequently did not attempt to use the manual to impeach the expert witness who was presented by the State, Dr. Rudzitis, who was the developer of the neutron activation analysis testing system for the State of Illinois and the author of the gunshot residue testing portion of the FBI manual. Accordingly, we cannot conclude the defendant was in any way prejudiced by this limitation on cross-examination.

The defendant lastly contends the court erred in sentencing him to the maximum period for a Class A misdemeanor and that the sentence was excessive.

He contends that the trial court failed to consider probation as an appropriate penalty for his conduct and points out that section 5—6—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—6—1) provides that except where specifically prohibited, a court shall impose probation or conditional discharge unless it is of the opinion that imprisonment is necessary to protect the public or that probation or conditional discharge would deprecate the seriousness of the offense and would be inconsistent with the ends of justice.

The record does show that the trial court did fairly consider probation as an alternative to the sentence imposed. The trial judge fully considered all factors relevant to the sentencing decision, including the presentence report. He gave consideration to the prior criminal record of the defendant which included imprisonment for the offense of assault with intent to kill and two fines for the driving offenses of reckless driving

and driving while intoxicated. The trial judge noted the necessity to deter others from similar conduct in the future and the likelihood of great bodily harm to the victims of defendant's conduct in shooting into the house. The trial judge noted the mitigating factors, particularly the hardship to the defendant's family caused by lack of support during incarceration. Nonetheless, the trial judge sentenced the defendant to 364 days' imprisonment.

■■■ This defendant has shown neither that the trial judge abused his discretion (*People v. Perruquet* (1977), 68 Ill. 2d 149) nor that the sentence is erroneous. (*People v. Choate* (1979), 71 Ill. App. 3d 267.) The record reveals no arbitrariness or caprice on the part of the judge and, in fact, all of the reasons the judge had for imposing the sentence may not have been stated on the record nor was there any requirement that he do that. It likewise appears that the court was aware of the sentencing alternatives available since they were set forth in the presentence report. Further, and although not specifically stated in the record, it appears the court complied with section 5—6—1(a) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—6—1(a)) in considering whether or not to place the defendant on probation, and no abuse of discretion is evident.

The judgment of the circuit court of Boone County is affirmed.

Judgment affirmed.

SEIDENFELD, P. J., and NASH, J., concur.