(No. 38790.—

DORRENCE KENNETH DARLING II, Appellee, *vs.* CHARLESTON COMMUNITY MEMORIAL HOSPITAL, Appellant.

*Opinion filed Sept. 29, 1965.—Rehearing denied Nov. 18, 1965.*

UNDERWOOD, J., specially concurring.

JACK E. HORSLEY and JOHN P. EWART, of CRAIG & CRAIG, of Mattoon, (WAYNE O. SHUEY and FRED H. KELLY, of counsel,) for appellant.

STANFORD S. MEYER, of Belleville, and JOHN ALAN APPLEMAN, of Urbana, for appellee.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

This action was brought on behalf of Dorrence Darling II, a minor, (hereafter plaintiff) by his father and next friend, to recover damages for allegedly negligent medical and hospital treatment which necessitated the amputation of his right leg below the knee. The action was commenced against the Charleston Community Memorial Hospital and Dr. John R. Alexander, but prior to trial the action was dismissed as to Dr. Alexander, pursuant to a covenant not to sue. The jury returned a verdict against the hospital in the sum of $150,000. This amount was reduced by $40,000, the amount of the settlement with the doctor. The judgment in favor of the plaintiff in the sum of $110,000 was affirmed on appeal by the Appellate Court for the Fourth District, which granted a certificate of importance. 50 Ill. App. 2d 253.

On November 5, 1960, the plaintiff, who was 18 years old, broke his leg while playing in a college football game. He was taken to the emergency room at the defendant hospital where Dr. Alexander, who was on emergency call that day, treated him. Dr. Alexander, with the assistance of hospital personnel, applied traction and placed the leg in a plaster cast. A heat cradle was applied to dry the cast. Not long after the application of the cast plaintiff was in great pain and his toes, which protruded from the cast, became swollen and dark in color. They eventually became cold and insensitive. On the evening of November 6, Dr. Alexander "notched" the cast around the toes, and on the afternoon of the next day he cut the cast approximately three inches up from the foot. On November 8 he split the sides of the cast with a Stryker saw; in the course of cutting the cast the plaintiff's leg was cut on both sides. Blood and other seepage were observed by the nurses and others, and there was a stench in the room, which one witness said was the worst he had smelled since World War II. The plaintiff re-

mained in Charleston Hospital until November 19, when he was transferred to Barnes Hospital in St. Louis and placed under the care of Dr. Fred Reynolds, head of orthopedic surgery at Washington University School of Medicine and Barnes Hospital. Dr. Reynolds found that the fractured leg contained a considerable amount of dead tissue which in his opinion resulted from interference with the circulation of blood in the limb caused by swelling or hemorrhaging of the leg against the constriction of the cast. Dr. Reynolds performed several operations in a futile attempt to save the leg but ultimately it had to be amputated eight inches below the knee.

The evidence before the jury is set forth at length in the opinion of the Appellate Court and need not be stated in detail here. The plaintiff contends that it established that the defendant was negligent in permitting Dr. Alexander to do orthopedic work of the kind required in this case, and not requiring him to review his operative procedures to bring them up to date; in failing, through its medical staff, to exercise adequate supervision over the case, especially since Dr. Alexander had been placed on emergency duty by the hospital, and in not requiring consultation, particularly after complications had developed. Plaintiff contends also that in a case which developed as this one did, it was the duty of the nurses to watch the protruding toes constantly for changes of color, temperature and movement, and to check circulation every ten to twenty minutes, whereas the proof showed that these things were done only a few times a day. Plaintiff argues that it was the duty of the hospital staff to see that these procedures were followed, and that either the nurses were derelict in failing to report developments in the case to the hospital administrator, he was derelict in bringing them to the attention of the medical staff, or the staff was negligent in failing to take action. Defendant is a licensed and accredited hospital, and the plaintiff contends that the licensing regulations, accreditation stand-

ards, and its own bylaws define the hospital's duty, and that an infraction of them imposes liability for the resulting injury.

The defendant's position is stated in the following excerpts from its brief: "It is a fundamental rule of law that only an individual properly educated and licensed, and not a corporation, may practice medicine. * * * Accordingly, a hospital is powerless under the law to forbid or command any act by a physician or surgeon in the practice of his profession. * * * A hospital is not an insurer of the patient's recovery, but only owes the patient the duty to exercise such reasonable care as his known condition requires and that degree of care, skill and diligence used by hospitals generally in that community. * * * Where the evidence shows that the hospital care was in accordance with standard practice obtaining in similar hospitals, and Plaintiff produces no evidence to the contrary, the jury cannot conclude that the opposite is true even if they disbelieve the hospital witnesses. * * * A hospital is not liable for the torts of its nurse committed while the nurse was but executing the orders of the patient's physician, unless such order is so obviously negligent as to lead any reasonable person to anticipate that substantial injury would result to the patient from the execution of such order. * * * The extent of the duty of a hospital with respect to actual medical care of a professional nature such as is furnished by a physician is to use reasonable care in selecting medical doctors. When such care in the selection of the staff is accomplished, and nothing indicates that a physician so selected is incompetent or that such incompetence should have been discovered, more cannot be expected from the hospital administration."

The basic dispute, as posed by the parties, centers upon the duty that rested upon the defendant hospital. That dispute involves the effect to be given to evidence concerning the community standard of care and diligence, and also the

effect to be given to hospital regulations adopted by the State Department of Public Health under the Hospital Licensing Act (Ill. Rev. Stat. 1963, chap. 111½, pars. 142-157.), to the Standards for Hospital Accreditation of the American Hospital Association, and to the bylaws of the defendant.

As has been seen, the defendant argues in this court that its duty is to be determined by the care customarily offered by hospitals generally in its community. Strictly speaking, the question is not one of duty, for "* * * in negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in the light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty." (Prosser on Torts, 3rd ed. at 331.) "By the great weight of modern American authority a custom either to take or to omit a precaution is generally admissible as bearing on what is proper conduct under the circumstances, but is not conclusive." 2 Harper and James, The Law of Torts, sec. 17.3, at 977-78.) Custom is relevant in determining the standard of care because it illustrates what is feasible, it suggests a body of knowledge of which the defendant should be aware, and it warns of the possibility of far-reaching consequences if a higher standard is required. (Morris, Custom and Negligence, 42 Colum. L. Rev. 1147 (1942); 2 Wigmore, Evidence, 3rd ed. secs. 459, 461.) But custom should never be conclusive. As Judge Learned Hand said, "There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. * * * Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so im-

perative that even their universal disregard will not excuse their omission." *The T. J. Hooper*, (2d cir. 1932,) 60 Fed. 2d 737, 740.

In the present case the regulations, standards, and by-laws which the plaintiff introduced into evidence, performed much the same function as did evidence of custom. This evidence aided the jury in deciding what was feasible and what the defendant knew or should have known. It did not conclusively determine the standard of care and the jury was not instructed that it did.

"The conception that the hospital does not undertake to treat the patient, does not undertake to act through its docors and nurses, but undertakes instead simply to procure them to act upon their own responsibility, no longer reflects the fact. Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and internes, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action. Certainly, the person who avails himself of 'hospital facilities' expects that the hospital will attempt to cure him, not that its nurses or other employes will act on their own responsibility." (Fuld J., in *Bing* v. *Thunig*, (1957) 2 N.Y. 2d 656, 143 N.E.2d 3, 8.) The Standards for Hospital Accreditation, the state licensing regulations and the defendant's bylaws demonstrate that the medical profession and other responsible authorities regard it as both desirable and feasible that a hospital assume certain responsibilities for the care of the patient.

We now turn to an application of these considerations to this case. The defendant did not object to the instruction on the issues, which followed Illinois Pattern Jury Instruction 20.01. Nor did it move to withdraw any issues from

the jury. Under section 68 of the Civil Practice Act, an entire verdict is not to be set aside because one asserted ground of recovery was defective or inadequately proven, if one or more of the grounds is sufficient, unless a motion to withdraw the issue in question was made. (Ill. Rev. Stat. 1963, chap. 110, par. 68(4).) Therefore we need not analyze all of the issues submitted to the jury. Two of them were that the defendant had negligently: "5. Failed to have a sufficient number of trained nurses for bedside care of all patients at all times capable of recognizing the progressive gangrenous condition of the plaintiff's right leg, and of bringing the same to the attention of the hospital administration and to the medical staff so that adequate consultation could have been secured and such conditions rectified; * * * 7. Failed to require consultation with or examination by members of the hospital surgical staff skilled in such treatment; or to review the treatment rendered to the plaintiff and to require consultants to be called in as needed."

We believe that the jury verdict is supportable on either of these grounds. On the basis of the evidence before it the jury could reasonably have concluded that the nurses did not test for circulation in the leg as frequently as necessary, that skilled nurses would have promptly recognized the conditions that signalled a dangerous impairment of circulation in the plaintiff's leg, and would have known that the condition would become irreversible in a matter of hours. At that point it became the nurses' duty to inform the attending physician, and if he failed to act, to advise the hospital authorities so that appropriate action might be taken. As to consultation, there is no dispute that the hospital failed to review Dr. Alexander's work or require a consultation; the only issue is whether its failure to do so was negligence. On the evidence before it the jury could reasonably have found that it was.

Defendant renews in this court its contention that it was

unfairly surprised by an amendment to plaintiff's complaint made at the close of his case. Prior to trial the complaint alleged:

"4. That the defendant corporation then owed to the said plaintiff a duty to use that degree of skill in the care of such patient as would be exercised by institutions of like kind and character in that county; but that in violation of the duties which the said defendant owed to the plaintiff, the said defendant was guilty of one or more of the following negligent and careless acts or omissions which directly and proximately caused injury and loss to the plaintiff:

\* \* \*

"O. That the defendant hospital failed to conform to and to observe one or more of the following standards customarily required of and adhered to by accredited hospitals in the area involved at that time \* \* \*."

At the close of his case plaintiff obtained leave to amend his complaint by changing "as would be exercised by" in the introductory portion of paragraph 4 to "required of" and by striking "customarily required of and" in subparagraph O. The defendant requested a continuance on the ground that it was unfairly surprised because these amendments effected a fundamental shift in theory, in that the plaintiff was now contending that the accreditation rules alone defined the hospital's duty. The trial judge refused the requested continuance. The appellate court found that there was no surprise, and we agree. The "required of" clause in the introductory paragraph was a legal conclusion. If the "customarily required of" phrase in subparagraph O was meant to express a legal duty it was also a conclusion; if it was a factual statement, the "adhered to by accredited hospitals in the area" phrase is no less difficult to prove. But even if there was a change in theory, an examination of the record indicates that defendant was not surprised. The plaintiff had filed a memorandum at the time of the pretrial conference, more than five months before the trial,

which stated the theory which the defendant contends is new.

The second major contention advanced by the defendant in this court is that it was prejudicial error to permit the cross-examination of its expert witnesses concerning the views of recognized authorities in their fields, upon the ground that the experts did not purport to base their opinions upon the views of these authorities. In support of this contention he relies upon *Ullrich* v. *Chicago City Ry.*, 265 Ill 338, and *City of Bloomington* v. *Shrock*, 110 Ill. 219. Those cases hold that an expert witness can only be interrogated about those texts upon which he expressly bases his opinion. The appellate court held that the cross-examination in this case met that test. We do not consider that determination to ascertain whether every detail on cross-examination of each expert witness fits within the rule announced in those cases, for we are satisfied that the rule is not supported by sound reasons, and should no longer be adhered to.

That rule has been criticized frequently by legal scholars. (6 Wigmore, Evidence, 3d ed. secs. 1690-92; McCormick, Evidence, sec. 296, p. 620, n. 3.) It was rejected in the Uniform Rules of Evidence (see Rule 63(31) and comment,) and in the Model Code of Evidence. (See Rule 529 and comment.) It has been rejected by the United States Supreme Court, (*Reilly* v. *Pinkus*, (1949) 338 U.S. 269, 94 L. ed. 63,) and by other courts as well. (60 A.L.R. 2d 77.) It is supported by the considerations that support the hearsay rule, but the inapplicability of those considerations to scientific works has been convincingly demonstrated by Wigmore. 6 Wigmore, Evidence, 3rd ed. secs. 1691-92.

The unsatisfactory quality of expert testimony has been the subject of frequent comment, and it has induced judicial action. (See *Opp* v. *Pryor*, 294 Ill. 538, 545; *Kemeny* v. *Skorch*, 22 Ill. App. 2d 160, 170; see also Supreme Court Rule 17—2, Ill. Rev. Stat. 1963, chap. 110, par. 101.17—2; Cleary, Handbook of Illinois Evidence, secs. 3.3, p. 41,

11.10, pp. 190-91.) An individual becomes an expert by studying and absorbing a body of knowledge. To prevent cross-examination upon the relevant body of knowledge serves only to protect the ignorant or unscrupulous expert witness. In our opinion expert testimony will be a more effective tool in the attainment of justice if cross-examination is permitted as to the views of recognized authorities, expressed in treatises or periodicals written for professional colleagues. (*Cf.* Model Code of Evidence, Rule 529.) The author's competence is established if the judge takes judicial notice of it, or if it is established by a witness expert in the subject.

Another contention of the defendant is that the judgment for $110,000 must be reduced to $100,000, the limit of its liability insurance, because its insurance is its only non-trust fund asset. The appellate court disposed of this contention on the ground that the defendant's allegations failed to establish that other nontrust funds did not exist. The plaintiff, however, suggests that the doctrine of charitable immunity announced in *Parks* v. *Northwestern University,* 218 Ill. 381, and modified in *Moore* v. *Moyle,* 405 Ill. 555, did not survive the decision of this court in *Molitor* v. *Kaneland Community Unit District,* 18 Ill.2d 11. It is appropriate that we dispose of that broader contention.

*Moore* v. *Moyle* qualified the doctrine of charitable immunity by permitting recovery against nontrust funds of a charitable corporation, specifically an insurance policy. In other respects it adhered to the doctrine of immunity expressed in *Parks* v. *Northwestern University.* In the *Molitor* case the immunity of school districts was sought to be justified upon the theory that it was required in order to protect public funds. In disposing of this contention we said: "We do not believe that in this present day and age, when public education constitutes one of the biggest businesses in the country, that school immunity can be justified on the protection-of-public-funds theory.

"In the first place, analysis of the theory shows that it is based on the idea that payment of damage claims is a diversion of educational funds to an improper purpose. As many writers have pointed out, the fallacy in this argument is that it assumes the very point which is sought to be proved, *i.e.,* that payment of damage claims is not a proper purpose. 'Logically, the "No-fund" or "trust fund" theory is without merit because it is of value only after a determination of what is a proper school expenditure. To predicate immunity upon the theory of a trust fund is merely to argue in a circle, since it assumes an answer to the very question at issue, to wit, what is an educational purpose? Many disagree with the "no-fund" doctrine to the extent of ruling that the payment of funds for judgments resulting from accidents or injuries in schools is an educational purpose. Nor can it be properly argued that as a result of the abandonment of the common-law rule the district would be completely bankrupt. California, Tennessee, New York, Washington and other states have not been compelled to shut down their schools.' * * * If tax funds can properly be spent to pay premiums on liability insurance, there seems to be no good reason why they cannot be spent to pay the liability itself in the absence of insurance." (18 Ill.2d at 22-23.) It was pointed out in the dissenting opinion in the *Molitor* case that the logic of the opinion invalidated the doctrine of charitable immunity. 18 Ill.2d at 38.

We agree that the doctrine of charitable immunity can no longer stand in the light of *Molitor* v. *Kaneland Community Unit District,* 18 Ill.2d 11. In addition to the reasons advanced in the *Molitor* case, a doctrine which limits the liability of charitable corporations to the amount of liability insurance that they see fit to carry permits them to determine whether or not they will be liable for their torts and the amount of that liability, if any. Whether or not particular assets of a charitable corporation are subject to exemption from execution in order to satisfy a judgment

does not determine liability. No such issue arises until liability has been determined. It may be, however, that *Moore v. Moyle* has been relied upon by charitable corporations in deciding whether to carry insurance and, if so, the amount of insurance to be carried. As in the *Molitor* case, therefore, except as to the plaintiff in the instant case, this aspect of our decision will be given prospective effect only, from the date upon which the opinion in this case becomes final.

One of plaintiff's attorneys in the course of examining Dr. Alexander asked him what had happened to several patients under his care. In each case the patient had died and the only purpose of the question seems to have been to suggest misleading inferences from that fact. One of the patients was over 70 and had died of a heart attack; the others had died of heart conditions or cancer. But explanatory information was supplied on redirect examination, and for that reason we do not consider the initial error in admitting this evidence sufficiently prejudicial to warrant reversal.

The defendant also renews here its contention that the trial court erred in its rulings on instructions. The plaintiff argues that all objections to the instructions were waived because the objectionable ones were not set out at length in the defendant's brief. The appellate court indicated that it accepted this argument, but it also considered the defendant's objections on their merits. No rule of court supports the technical rule for which the plaintiff argues, and we think it is unwarranted.

The defendant objects to the giving of plaintiff's instructions 3A and 6A, which stated certain bylaws and accreditation regulations, on the basis that they singled out evidence. It also objects to plaintiff's instruction 7B, on the ground that it singled out answers to certain interrogatories. We have examined these instructions and do not believe that prejudicial emphasis was given to any evidence. The defendant also argues that it was error to refuse to instruct

the jury that only licensed physicians can practice medicine and that the customary standards of the community establish the duty of the hospital, and to give any instruction which indicated it was the duty of the hospital to supervise the competence of its staff members. The trial court did not err in its ruling upon these matters.

Defendant has renewed in this court some of the other numerous contentions it advanced in the appellate court. All of them were discussed and determined in the exhaustive opinion of the appellate court. (50 Ill. App. 2d 253 to 337.) We do not believe it is necessary to discuss them again at length. That court correctly disposed of defendant's arguments concerning improprieties during closing argument. (50 Ill. App. 2d at 334-36.) Counsel for both parties indulged in improper argument and we cannot say the inproprieties on one side out-weighed those on the other.

The judgment of the Appellate Court for the Fourth District is affirmed.

*Judgment affirmed.*

Mr. JUSTICE UNDERWOOD, specially concurring:

I concur in the decision in so far as it relates to the doctrine of charitable immunity only because I believe this result is compelled by *Molitor* v. *Kaneland Community Unit District,* 18 Ill.2d 11.