MARY ROHE, as Mother and Next Friend of Patrick J. Rohe, a Minor, *et al.*, Plaintiffs-Appellants, v. PINAKINI S. SHIVDE *et al.*, Defendants-Appellees.

First District (5th Division) No. 1—87—1439

Opinion filed September 14, 1990.

James H. Canel, Ltd., of Chicago (James H. Canel, of counsel), for appellant.

Brian C. Fetzer, of Johnson, Cusack & Bell, Ltd., of Chicago (Thomas H. Fegan, of counsel), for appellee Pinakini S. Shivde.

Lord, Bissell & Brook, of Chicago (Judy Platt Perlman, Hugh C. Griffin, and Diane I. Jennings, of counsel), for appellee Little Company of Mary Hospital.

PRESIDING JUSTICE COCCIA delivered the opinion of the court:

This action was brought on behalf of Patrick Rohe (Patrick), by his mother and next friend, Mary Rohe, and by Mary and Dennis Rohe, to recover for injuries sustained by their minor son as a result of alleged medical malpractice. Specifically, plaintiffs' complaint, filed in April 1982, charged that Dr. Pinakini Shivde (Dr. Shivde) was negligent in failing to diagnose and treat Patrick's bilateral, congenital hip dislocation and that Little Company of Mary Hospital (the Hospital) was both primarily and vicariously liable for the negligent medical care which Patrick received. The complaint also requested damages for Patrick's pain, suffering and disability, and for the parents' related medical expenses. Following protracted discovery, and a negotiated settlement with a later-added physician defendant, the trial court entered a final and appealable order on April 10, 1987, granting summary judgment in favor of the Hospital and denying plaintiffs' motion to vacate a previous order granting summary judgment to Dr. Shivde. From these orders, plaintiffs now appeal.

The record discloses that Patrick was born at 3:35 a.m. on September 5, 1981, at Little Company of Mary Hospital in Chicago. Immediately after birth, he was taken from the delivery room to the Hospital's neonatal intensive care unit, suffering from respiratory distress. Dr. Shivde was contacted by the intensive care nursery at approximately 4 a.m., and again at 5 a.m., and gave telephone orders to his attending nurse at these times. Dr. Shivde first saw Patrick on her regular daily rounds of the neonatal intensive care unit later that day and conducted a physical examination sometime prior to 12:50 p.m. The results of this examination included a diagnosis of polycythemia and secondary hypoglycemia. During the next five days, Patrick remained in the intensive care unit, where he was visited and examined by Dr. Shivde on a daily basis. Dr. Shivde also spoke with Mary Rohe several times about his condition. Despite the onset of jaundice on the third day, Patrick made gradual progress. By September 10, when he was discharged from the Hospital, his respiratory distress and other diagnosed medical problems had disappeared, with the exception of a mild heart murmur. At discharge, Dr. Shivde informed his mother about the heart murmur and advised her to make an appointment with a pediatrician to have it checked. At no time, from his admission to the intensive care nursery until his discharge from the Hospital, did Dr. Shivde note anything in Patrick's medical chart relating to his hips or discuss the condition of his hips with his mother.

In a discovery deposition taken December 10, 1982, Mary Rohe

testified that when Patrick was about one month old, she first noticed that his right foot turned outward. When this condition did not change during the next few months, she had Patrick examined by an orthopedic specialist in February 1982. The specialist determined that Patrick had congenitally dislocated hips and arranged his admission to Christ Hospital in Oak Lawn, Illinois, for immediate treatment with traction. This treatment was followed by surgery to reposition and cast the hips. Four subsequent hospitalizations were required in order to recast Patrick's hips until they were properly repositioned. In July 1982, the cast was removed and Patrick was fitted for a brace. At the time of the deposition, he was still required to wear the brace at night.

Little Company of Mary is a licensed not-for-profit hospital which in September 1981 maintained newborn nurseries and a neonatal intensive care unit. The Hospital entered into a written contract with Dr. Shivde's professional corporation, Neonatologist, Limited, in July 1977. Under the terms of the agreement, Dr. Shivde received an annual salary in return for carrying out specific administrative duties. These included supervising the operations of the newborn nurseries and intensive care unit, formulating medical policies for these units consistent with Hospital regulations, staffing these facilities under the direction of the department of pediatrics, providing educational programs in the field of neonatology to Hospital staff, and providing 24-hour coverage of the newborn facilities, with a neonatologist available for assistance at high-risk deliveries. The contract further provided that all infants admitted to the neonatal intensive care unit of the Hospital were to be admitted under the name of physicians employed by Neonatologist, Limited, which assumed full responsibility for their care. Although compensated by the Hospital for the above-mentioned administrative responsibilities, Dr. Shivde's professional corporation billed the infants' parents directly for the medical services which she provided in the Hospital's neonatal intensive care nursery. The contract, executed July 1, 1977, was by its terms automatically renewable from year to year, absent 90-day written notice prior to the expiration of a term.

In her discovery deposition of August 30, 1983, Dr. Shivde stated that her relationship with the Hospital changed somewhat after 1978. She explained that between 1978 and 1982, when she left the Chicago area to practice in another State, she did not operate under a written contract with the Hospital or receive an annual salary. Instead, the Hospital paid her "minimal compensation," essentially for arranging for a neonatologist to be available on call, 24 hours per day, for its

high-risk newborns. She further stated that, during those years, she and the Hospital considered all of the infants in the neonatal intensive care unit to be her "private patients," and that all admissions to the unit were made in her name. In other words, she regarded the newborns admitted to the Hospital's intensive care nursery as "[her] practice," and billed their parents directly for her medical services. Although a small number of pediatricians, all of whom had staff privileges at the Hospital, were also permitted to treat newborns there, she estimated that she provided about 90% of the newborn care at the Hospital during the relevant period. In addition, any sick infants, such as Patrick Rohe, were exclusively under her care. From the record before us, it is not clear whether Dr. Shivde and the Hospital were, in fact, still operating under the terms of the July 1, 1977, contract in September of 1981. We note that the Hospital's motion for summary judgment, which it amended, by leave of the court, specifically to "clarify the status of Dr. P. Shivde vis-a-vis *** [the] Hospital," refers to the attached, July 1, 1977, "service agreement executed between it and Dr. Shivde as support [for the premise] that there was no *employment* relationship between the two for professional services actually rendered to patients by Dr. Shivde or her corporation in the Neonatal Intensive Care Unit at [the] Hospital *at the time of this incident.*" (Emphasis added.) In any event, the defendants' consistent position throughout this litigation has been that Dr. Shivde was not an employee of the Hospital at any time relevant to this case.

Dr. Shivde's discovery deposition further reveals that she was certified in pediatrics by the American Board of Pediatrics in December 1980. Although she stated that she was preparing to take a subspecialty Board examination in November 1983, she was not Board certified in any pediatric subspecialty as of August 1983. Her medical training in pediatrics, and to a lesser degree, in neonatology, was quite extensive. It included post-graduate work in India and a two-year residency at Christ Hospital, both in pediatrics, as well as a two-year fellowship in neonatology at Christ Hospital, completed in 1977. Dr. Shivde estimated that between 1973 and 1981, she performed thousands of "newborn examinations," which include manipulation of the infant's hips to detect dislocation or subluxation.

Dr. Shivde described in detail the hip examination which she performed on newborn infants as a matter of routine practice, and its significance. She stated that she regularly administered "Ortalini's test," a procedure which involves flexing the infant's hips and knees and abducting the hips to determine if a hip is dislocated. She also

performed the "Barlow maneuver," which involves the physician pushing the head of the femur back and out, with his thumb, in order to determine whether it can be dislocated. As Dr. Shivde explained, if an infant's hips could be dislocated or subluxed in the course of either of these tests, a congenital problem was indicated and she would consult an orthopedic specialist about the condition. She further stated that detection of subluxation or dislocation of the hips in the course of the newborn examination is important because failure to detect such conditions could result in dysplasia of the hip joint, or acetabulum, which holds the head of the femur. Medical consequences of this condition include muscular problems, contractures, and disability. Dr. Shivde also agreed with the statement that the prognosis for a good recovery and good development of the acetabula in affected infants was related to early intervention and treatment.

Dr. Shivde's deposition testimony focused on both "newborn examinations" and "discharge examinations" of newborn infants, both of which she routinely conducted at the Hospital. The discharge examination was done just before an infant left the Hospital and involved the same procedures as the newborn examination, including Ortalini's test and the Barlow maneuver. Dr. Shivde stated that if an infant's hip is dislocatable at birth and is also dislocatable at discharge, her initial diagnosis of a hip problem is confirmed. Plaintiffs' counsel inquired about hip dislocations which were diagnosed, and determined to be congenital, at a later time in the postnatal period. He asked whether the hips would also have been dislocatable or subluxible at birth. Dr. Shivde responded that in most cases, a congenital dislocation would have been detectable from birth; however, in a small percentage of cases, perhaps from 1% to 5%, hips which are found to be normal at birth could be dislocatable in the future. She explained that, generally, these are subluxible hips with unstable joints which would later dislocate. Because the Barlow maneuver is "not [one] hundred percent sensitive," these unstable joints are not detected, during either the newborn or discharge examination, in a very small percentage of infants.

Asked if she could specifically recall Patrick Rohe and his medical problems following birth, Dr. Shivde stated that she would not have remembered him without the opportunity to review his medical chart, as he was not one of her most seriously ill newborns. However, she was able to describe his condition and his course of treatment, as previously summarized, by referring to the medical chart which she had prepared at the time.

The Little Company of Mary medical chart for Patrick Rohe, con-

sisting of three pages, is the only written documentation of Patrick's medical treatment which is included in the record on appeal. The first page, titled "Physician's Record of Newborn Infant," is a preprinted examination form listing 14 areas for examination, such as "General Appearance," "Eyes," "Lungs," and "Heart." Item number 14 is "Extremities (Including Clavicles and Abduction of Hip Joints)." Next to the listed items are two columns, headed "Admission Examination" and "Discharge Examination," with space for the physician to designate one of two codes for each of the 14 items. The codes are "O," for "No Abnormality," and "X," for "Abnormality." There is added space for the physician's description of abnormal findings and for the physician's "progress notes." While some basic information, such as Patrick's date of birth and birth weight, are recorded at the top of this form, which is dated September 5, 1981, and signed by Dr. Shivde, no codes or descriptions of abnormal findings appear next to any of the 14 items. Instead, the notation, "See Progress Notes Please," appears in this space. The second page of Patrick's medical chart, labeled "Progress Notes," is a summary of the infant's condition and treatment over the five-day period from September 5 to September 10, 1981. It is entirely in Dr. Shivde's handwriting. A third page, labeled "Discharge Summary," is a typewritten summary drafted from the progress notes on the second page and signed by Dr. Shivde. The discharge summary lists the final diagnosis of Patrick's medical condition, for which he was treated, as "hyperviscosity with secondary hypoglycemia [and] hyperbilirubinemia."

As Dr. Shivde acknowledged at her deposition, no reference whatsoever, positive or negative, is made to Patrick's hips on any page of his medical chart. Dr. Shivde stated that there are several things which she checks in the course of examining every newborn infant, but does not chart, because she tends to restrict her notations to positive, or abnormal, findings. Nonetheless, she recalled doing a second "complete" and "thorough" physical examination, as outlined in the printed admission and discharge examination form, at the time of Patrick's discharge from the Hospital on September 10, 1981. She stated that, during this examination, she would have reviewed Patrick's hips. If she had had a positive finding, she would have recorded that fact and would have sought a consultation with an orthopedic surgeon regarding the management of the child's condition.

Plaintiff's amended complaint, filed June 18, 1982, specifically charged Dr. Shivde with (1) failing to perform a clinical examination to assess the presence of congenital hip dislocation; (2) failing to inform the parents of the need for follow-up care in the presence of

congenital hip dislocation; (3) failing to perform adequate diagnostic tests; and (4) failing to consult with an orthopedic physician in the presence of congenital hip dislocation. It alleged that plaintiffs' pain, suffering, and medical costs were the proximate result of these negligent acts.

Count II of the amended complaint charged the Hospital with negligence in failing to provide neonatal care consistent with the prevailing standard for similar institutions. Specifically, plaintiffs alleged that the Hospital (1) failed to require attending pediatricians to perform a newborn examination for the assessment of congenital hip dislocation as required by Hospital rules and procedures; (2) permitted physicians unskilled in the performance of neonatal care to provide such care; and (3) permitted an infant to be discharged from the neonatal intensive care unit "without having ascertained" whether there was a presence or absence of congenital hip dislocation. In addition, plaintiffs' "Second Amended Complaint," filed November 3, 1983, further alleged that the Hospital was negligent in restricting the care of neonates "so that only a physician uncertified in pediatrics and uncertified in *** neonatology was providing that care exclusively within the nursery of [the] [H]ospital."

On April 25, 1984, the trial court ordered that all of plaintiffs' expert witnesses were to be deposed on or before August 1, 1984, and that all of defendants' experts were to be deposed before September 10, 1984. However, plaintiffs' "Answers to Interrogatories," filed November 9, 1984, stated that plaintiffs' experts were not yet determined. At a subsequent pretrial conference, the court extended the deadline for deposing plaintiffs' experts until March 20, 1985, and set May 20, 1985, as the date for closing all discovery. Plaintiffs eventually presented one expert witness, Dr. Benjamin Emmanuel (Dr. Emmanuel), who was deposed on May 21, 1985. Dr. Emmanuel stated at his deposition that he had very briefly reviewed Patrick's medical chart. However, he further stated that he knew nothing about the Hospital, did not know what treatment was rendered to Patrick, and had no opinion with regard to the care and treatment of Patrick by the Hospital. Dr. Emmanuel also testified that he had no opinion with regard to the conduct of Dr. Shivde. The parties agree that Dr. Emmanuel made no statements at any time which were directly critical of either Dr. Shivde or the Hospital. Nor did Dr. Emmanual suggest or imply that either of the defendants might not have complied with the appropriate standard of care in the treatment of Patrick Rohe.

On June 7, 1985, Dr. Shivde moved the court, pursuant to Supreme Court Rules 219 and 220, to bar plaintiffs from presenting any

expert testimony at trial, and to limit the testimony of Dr. Emmanuel to those opinions elicited at his deposition. (107 Ill. 2d Rules 219, 220.) In support of her motion, Dr. Shivde pointed out that plaintiffs had missed previous discovery deadlines before presenting Dr. Emmanuel, who had no opinion as to her conduct or Patrick's medical care, and that plaintiffs had also failed to disclose any additional expert witnesses. The Hospital subsequently filed a similar motion. In an order dated August 8, 1985, the court granted both motions. The order specifically states that "[p]laintiff is barred from presenting any expert testimony as to Dr. Shivde [and] Little Co. of Mary Hospital aside from what may be elicited from Dr. Shivde as an adverse witness."

On September 30, 1985, Dr. Shivde moved for summary judgment. (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005.) Her motion relied on her deposition testimony, the trial court's order barring plaintiff from presenting additional expert testimony, and a sworn affidavit which she attached to the motion. Dr. Shivde's affidavit stated: (1) that she was a licensed Illinois physician, Board certified in pediatrics; (2) that she practiced in the specialty of neonatology at the Hospital from 1977 until 1982; (3) that she had knowledge of the standard of care of a reasonably well-qualified pediatrician and neonatologist in the Chicago area in 1981; (4) that, in her opinion, the standard of care requires that a newborn's hips be examined twice in the nursery to detect dislocation or subluxation: (5) that she performed the appropriate examinations of Patrick Rohe's hips, namely, the Ortalini Test and the Barlow maneuver, "upon two occasions—September 5, 1981 and September 10, 1981"; (6) that the examinations "revealed no abnormalities, no dislocation, and no subluxation," and, "in view of the normal test results, the standard of care did not require that [she] inform Patrick's parents as to the possible presence of a congenital hip dislocation or *** perform or order additional diagnostic tests or call in an orthopedic consultation"; and (7) that based on her review of Hospital records, her recollection of Patrick Rohe, and her knowledge, training and experience in neonatology, it was her opinion, to a reasonable degree of medical certainty, that she "complied in every way with the standard required of a reasonably well-qualified [p]ediatrician and [n]eonatologist in [her] care and treatment of Patrick J. Rohe" at the Hospital in September 1981.

In response to the summary judgment motion, plaintiffs argued that a material issue of fact existed with regard to whether Dr. Shivde had actually performed the newborn and discharge examinations of Patrick's hips which her own testimony had established as the

applicable medical standard. Furthermore, they noted that Dr. Shivde had conceded that only in a very small percentage of cases would a physician not detect a congenital hip dislocation when properly examining a newborn, and also that failure to detect such condition increases the risk of harm to an infant. However, Dr. Shivde had noted absolutely nothing indicative of a hip examination in Patrick's medical chart. Plaintiffs therefore urged the court to find that, viewing the motion in a light most favorable to them, a factual question remained that would preclude summary judgment in the doctor's favor.

Dr. Shivde, in her reply to plaintiffs' response, maintained that plaintiffs were attempting to argue that the standard of care for a reasonably well-qualified neonatologist requires that the results of a hip examination be charted. However, as she noted, plaintiffs had not provided expert testimony to establish such a standard, while she had presented both deposition testimony and an affidavit stating that she had knowledge of the appropriate standard of care and that she had complied with it. For these reasons, she believed that summary judgment in her favor should be entered.

On December 26, 1985, the trial court granted Dr. Shivde's motion for summary judgment. A similar motion was then filed by the Hospital, citing plaintiffs' failure to produce any expert witnesses to establish the Hospital's applicable standard of care, or to establish that either Dr. Shivde or the Hospital breached the applicable standard, and that such a breach caused Patrick's injuries. The Hospital's motion also relied upon the trial court's previous order barring plaintiffs from presenting any additional expert witnesses at trial. On April 21, 1986, the Hospital's motion for summary judgment was granted.

At this juncture, the trial court proceedings were unfortunately complicated by the entry of an order dismissing the entire case for want of prosecution, due to an administrative mix-up, on March 7, 1986. It would serve no purpose to recount the serpentine maze of motions and orders which vacated the dismissal and eventually reinstated summary judgments in favor of both defendants. It is sufficient to state that on April 10, 1987, the trial court denied plaintiffs' motion to vacate the December 26, 1985, order granting summary judgment to Dr. Shivde, found that order to be final and appealable, and further ordered that "the motion for summary judgment of Little Company of Mary Hospital is granted."

OPINION

Plaintiffs first contend that several material issues of fact should

preclude summary judgment for Dr. Shivde. They maintain that factual questions remain regarding (1) whether Dr. Shivde did perform the required diagnostic examinations on Patrick Rohe as part of a newborn examination and again as part of a discharge examination, but failed to document them; (2) whether she performed the required examinations, but was unable to diagnose the congenital hip dislocations because they were of a rare or unusual variety that may occur in a small fraction of all cases and are not diagnosable in newborns; and (3) whether, even if the examinations were properly done, she was also under a duty to document a complete and detailed physical examination upon Patrick's admission and discharge from the nursery. For reasons which follow, we find that the trial court correctly determined that Dr. Shivde was entitled to summary judgment as a matter of law.

■■■ It is well established that summary judgment is appropriate where there is no material issue of fact. (*Diggs v. Suburban Medical Center* (1989), 191 Ill. App. 3d 828, 548 N.E.2d 373; *Prather v. Decatur Memorial Hospital* (1981), 95 Ill. App. 3d 470, 420 N.E.2d 810.) A defendant may move for summary judgment at any time (Ill. Rev. Stat. 1987, ch. 110, par. 2—1005(b)), and the trial court will grant the motion if "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" (Ill. Rev. Stat. 1987, ch. 110, par. 2—1005(c); *Addison v. Whittenberg* (1988), 124 Ill. 2d 287, 294, 529 N.E.2d 552, 555). However, if there are facts upon which reasonable persons may disagree, or varying inferences could fairly be drawn from the facts, the motion must be denied and resolution of these facts and inferences must be made at the trial. (*Diggs*, 191 Ill. App. 3d at 832, 548 N.E.2d at 376; *Montes v. Hawkins* (1984), 126 Ill. App. 3d 419, 423, 466 N.E.2d 1271, 1274.) Conversely, where facts contained in an affidavit in support of a motion for summary judgment are not contradicted by a counteraffidavit, such facts must be taken as true, and the nonmovant risks entry of summary judgment. *Diggs*, 191 Ill. App. 3d at 833, 548 N.E.2d at 376; *Bennett v. Raag* (1982), 103 Ill. App. 3d 321, 326, 431 N.E.2d 48, 51.

■■■ In order to recover for medical negligence, plaintiffs must establish the breach of a duty. (*Conrad v. Christ Community Hospital* (1979), 77 Ill. App. 3d 337, 341, 395 N.E.2d 1158, 1160.) This duty is the accepted medical standard of care in the community. (*Taylor v. City of Beardstown* (1986), 142 Ill. App. 3d 584, 600, 491 N.E.2d 803, 814.) Consequently, the well-settled general rule is that a plaintiff in a

medical malpractice case must present expert testimony to establish all of the following: (1) the applicable standard of care against which defendant's actions may be measured; (2) defendant's deviation from the standard of care; and (3) that the defendant's deviation from the standard proximately caused the plaintiff's injury. (*Addison v. Whittenberg* (1988), 124 Ill. 2d 287, 297, 529 N.E.2d 552, 556; *Purtill v. Hess* (1986), 111 Ill. 2d 229, 241-42, 489 N.E.2d 867, 872; *Roberts v. Sisters of Saint Francis Health Services, Inc.* (1990), 198 Ill. App. 3d 891, 896, 556 N.E.2d 662, 666; *Diggs v. Suburban Medical Center* (1989), 191 Ill. App. 3d 828, 833, 548 N.E.2d 373, 377.) Generally, expert testimony is needed to support a charge of malpractice because jurors are not skilled in the practice of medicine and would find it difficult without expert testimony to determine a lack of skill or care on the part of a physician. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256-57, 381 N.E.2d 279, 282.) Exceptions to this general rule are few. For example, expert testimony is not required to establish the applicable standard of care where the physician's treatment is so common or the act so grossly negligent that a layperson could readily evaluate it in light of his own knowledge and experience. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 242, 489 N.E.2d 867, 872; *Walski*, 72 Ill. 2d at 256-57, 381 N.E.2d at 282.) In the usual case, where expert testimony is required to establish the applicable standard of care, it is well settled that the testimony of the defendant doctor may suffice to establish the standard. (*Beals v. Huffman* (1986), 146 Ill. App. 3d 30, 38, 496 N.E.2d 281, 287; *Taylor v. City of Beardstown* (1986), 142 Ill. App. 3d 584, 598, 491 N.E.2d 803 813; *Anderson v. Martzke* (1970), 131 Ill. App. 2d 61, 65, 266 N.E.2d 137, 139.) Illinois courts have also held that where a defendant doctor submits his own affidavit in support of a summary judgment motion, and in his affidavit asserts that he was familiar with the standard of care in the geographic location and that the treatment and care rendered by him was in compliance with that standard, "and where the plaintiff has failed to bring forth evidence to the contrary even though afforded ample time to so do, then such an affidavit is sufficient for entry of summary judgment in favor of the physician." *Taylor*, 142 Ill. App. 3d at 600, 491 N.E.2d at 814, quoted in *Beals*, 146 Ill. App. 3d at 38, 496 N.E.2d at 287.

Applying these principles to the case at bar, we conclude that plaintiffs did not meet their burden of contradicting the facts asserted in Dr. Shivde's sworn affidavit with contrary evidence, so as to create a material issue of fact which would preclude summary judgment in the doctor's favor. First, the parties do not contend that the newborn examinations and diagnoses at issue here would fall into any recog-

nized exception to the general rule requiring expert medical testimony to establish the applicable standard of care. Furthermore, they agree that Dr. Shivde has, by her own sworn affidavit and deposition testimony, established the accepted standard of medical care by which her conduct should be judged. Nonetheless, plaintiffs claim that a question remains as to whether Dr. Shivde complied with that standard. They contend that her affidavit contradicts her deposition testimony in that "she claims specific detailed recall of performing the required examinations on two specific dates, September 5 and September 10, 1981," while at her discovery deposition, taken two years earlier, "she had no recollection pertinent to this litigation of treating Patrick Rohe." We must disagree. Having carefully reviewed defendant Shivde's discovery deposition, and having compared it with her later-filed affidavit, we can find no significant discrepancies; nor do we find that one contradicts the other. The following are pertinent excerpts from Dr. Shivde's deposition transcript:

"Q. [Plaintiff's attorney]: Do you recall anything about the infant independent of the chart?

A. [Dr. Shivde]: After going through the chart, I did recall but if you were to ask me otherwise, I would not have recalled.

\* \* \*

Q. And having looked at the chart, does that refresh your recollection about this child?

A. Yes.

Q. Now, having looked at the chart, do you remember anything about him that is not contained in the chart?

A. Yes, obviously, the—I haven't read the examination of the hips which I do with every newborn, but there are several other things which I check and I don't note them because they are negative points and I sort of restrict myself to the positive things.

Q. Is there anything else that you, having looked at the chart, recall about Patrick Rohe, having refreshed your recollection?

A. I remember his initial respiratory distress.

\* \* \*

Q. Did you make a note of your initial examination of the infant?

A. Right. In the progress notes.

Q. Is that the 9-5-81 note?

A. Yes.

\* \* \*

Q. Would you look at the newborn examination form. It's

forward of that.

A. Yes.

Q. Okay. Did you make an entry on that sheet?

A. Right.

Q. What did you—what entry did you make?

A. I just wrote, 'See progress notes,' because there are several findings that usually—.

* * *

Q. And then you signed off on it?

A. Right.

* * *

Q. Do you recall doing anything specifically at the time you last saw the infant on the 10th, aside from writing that [progress] note?

A. I did an examination, you know. Before discharge, I do [a] complete physical again.

Q. You would have repeated the same physical examination?

A. Yes, thorough physical.

Q. And at the time of discharge, you would have been aware of the discharge and admission examination forms that you had in the hospital?

A. Yes.

Q. Do you recall whether or not you did a systems review as outlined in the admission discharge examination form at the time of discharge?

A. Yes. That's what we do in a physical exam.

Q. Do you—and I take it as part of that examination, you would have reviewed the hip?

A. Right.

Q. And if you had had a positive finding on the examination of the hips, you would have recorded it?

A. Right. I would have taken a consultation.

* * *

Q. Can you explain [the later-diagnosed hip dislocation not being detectable or discerned at either the newborn or discharge examination]?

A. It might have been a subluxated hip which is not detectable several times. I had done my examination."

Although the language used in these excerpts, and in other portions of Dr. Shivde's deposition, may not mirror the more precise, formal language of her affidavit, the two documents are consistent in the essentials. Her testimony is that, having refreshed her recollection of

Patrick by reviewing his chart, she could and did recall treating him at the Hospital in September 1981, and that she twice performed a complete physical examination as outlined in the Hospital's admission/discharge form, according to her routine procedure, although she admittedly did not chart some of her normal findings. She performed the first examination of Patrick when she first visited him in the nursery on September 5, which the chart indicates was at approximately 12:50 p.m., or about nine hours after his birth. She then repeated the same "complete" physical examination of Patrick just prior to his discharge from the Hospital on September 10. In short, her deposition testimony in no way impeaches, or raises an issue of material fact with regard to, the assertions in her later-filed affidavit.

■ Moreover, plaintiffs have failed to present any factual basis, by way of counteraffidavit or expert testimony, to refute the specific assertions made in Dr. Shivde's affidavit, either as to the standard of care required or as to the fact that she complied with that standard in her treatment of Patrick. Where plaintiffs have failed to present evidence which would indicate expert medical opinion to sustain the allegations in their complaint as contrasted to the affidavits filed by defendants, or that they would be able to obtain such expert medical opinion in the future, then summary judgment in favor of defendants is proper. (*Bennett v. Raag* (1982), 103 Ill. App. 3d 321, 327, 431 N.E.2d 48, 52.) Here, plaintiffs had more than ample time to bring forth at least one expert who could either refute Dr. Shivde's statement of the applicable standard, or her assertion that she complied with that standard, or to suggest that Dr. Shivde's conduct may have in some way caused Patrick's injuries or increased his risk of injury. They have not done so. Plaintiffs missed discovery deadlines several times before presenting Dr. Emmanuel, who had not read Patrick's chart completely and stated that he knew nothing about the Hospital or Patrick's condition and had no opinion concerning either the applicable standard of care or the conduct of either defendant. Furthermore, the court's order of August 8, 1985, specifically barred plaintiffs from adducing any further expert testimony from Dr. Emmanuel or any other expert, other than what Dr. Shivde might provide as an adverse witness.

■ We also note that plaintiffs have never challenged the trial court's order barring additional expert testimony. Plaintiffs state that they raised no objection because they do not dispute the applicable standard of care, which has already been established by Dr. Shivde. However, plaintiffs also have a duty to produce expert testimony supportive of their position with respect to breach the standard and

with respect to proximate cause. As this court stated in a recent decision affirming summary judgment in favor of a defendant physician:

"The motion for summary judgment was granted more than six years after this case was initially filed. Plaintiff had ample opportunity during this six-year period to obtain an opinion critical of [the physician's] care to raise a genuine issue of material fact, precluding summary judgment, but plaintiff failed to do so. ***

* * *

This case is similar to many of the other decided cases where summary judgment was granted after plaintiff's expert witnesses failed to offer opinions critical of a defendant's care. [Citations.] *** [I]t is incumbent on the plaintiff to substantiate his allegations through expert testimony in order to defeat a motion for summary judgment. The failure of a nonmovant in a medical malpractice case to bring forth experts, *who will raise the necessary inferences* sufficient to defeat a motion for summary judgment, is fatal and will result in the entry of summary judgment to the movant." (Emphasis added.) *Diggs v. Suburban Medical Center* (1989), 191 Ill. App. 3d 828, 833-34, 548 N.E.2d 373, 377-78.

It is the plaintiff's duty in a medical malpractice case to present the testimony of at least one expert witness who will at least raise an inference that the conduct of the defendant physician did not comply with the applicable standard of care. In another case recently decided by this court, summary judgment in favor of a physician was reversed, where, unlike the instant case, this threshold requirement was met. (*Cwiertnia v. Zaborowski* (1989), 192 Ill. App. 3d 841, 549 N.E.2d 655.) In *Cwiertnia*, one of the plaintiff's experts indicated that the defendant, a junior status resident, had the duty to note in the medical record that he had considered a diagnosis of pulmonary embolism, in order to bring that aspect of the patient's condition to the attention of his superiors, even though his superiors had final responsibility for patient care. This expert also indicated surprise at the fact that such a finding was not noted by the defendant. Although other expert witnesses had stated that the defendant complied with the applicable standard of care, and the first expert also testified that the lack of charting would not have caused the patient's injury if defendant's medical superiors had, in fact, discussed pulmonary embolism at the time they made their treatment decision, the suggestion of possible noncompliance made by the expert was alone sufficient to raise an issue of fact precluding summary judgment. (*Cwiertnia,* 192

Ill. App. 3d at 846-47, 549 N.E.2d at 659-60.) The crucial distinction between *Cwiertnia* and the instant case is that plaintiffs have failed to present any expert testimony whatsoever which even raises an inference that Dr. Shivde did not comply with the applicable standard of care and that such noncompliance may have been a factor in causing or exacerbating Patrick's later-diagnosed hip problems.

We recognize, of course, that it is often difficult for plaintiffs to secure a medical expert to testify against a member of the same profession. For this reason, courts should afford plaintiffs every opportunity to secure the services of an expert before granting summary judgment based on a failure to support their allegations with the required medical testimony. (*Chiero v. Chicago Osteopathic Hospital* (1979), 74 Ill. App. 3d 166, 176, 392 N.E.2d 203, 211.) However, we cannot say that summary judgment in this case was premature. Three years and four months elapsed between the filing of plaintiffs' initial complaint and the order of the court barring further expert testimony; five years elapsed between the complaint and the final order of summary judgment in favor of defendants. Plaintiffs do not contend that they could have produced additional experts, or that such experts, if produced, would have been critical of defendants' conduct. Under these circumstances, the trial court properly found that summary judgment in favor of Dr. Shivde was appropriate.

We turn next to that portion of the trial court's order granting summary judgment to the Hospital. Because we have determined that summary judgment was proper as to Dr. Shivde, it necessarily follows that no claim against the Hospital based on vicarious liability for her conduct can stand. (*Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 533, 513 N.E.2d 387, 399.) Therefore, we need not address the issues related to agency and apparent agency which plaintiffs have raised. There remains a question, however, as to whether summary judgment for the Hospital was premature because the Hospital may have breached an independent duty toward Patrick Rohe, making it directly liable for Patrick's injuries.

There are two theories of liability for recovery against a hospital in a medical malpractice case: (1) the hospital may be liable based upon a principal-agency relationship between the hospital and the physician; and (2) the hospital may owe a duty independent of any relationship between physician and patient to review and supervise the medical care administered to a patient. (*Reynolds v. Mennonite Hospital* (1988), 168 Ill. App. 3d 575, 578, 522 N.E.2d 827, 829; *Beals v. Huffman* (1986), 146 Ill. App. 3d 30, 41, 496 N.E.2d 281, 289.) For example, a hospital has a duty to know the qualifications and the

standard of performance of the physicians who practice on its premises. It is a breach of the hospital's duty of care to its patients to permit a physician whom the hospital knows or should have known is unqualified, or negligent, to practice on its premises. (*Reynolds v. Mennonite Hospital*, 168 Ill. App. 3d at 578, 522 N.E.2d at 829; *Pickle v. Curns* (1982), 106 Ill. App. 3d 743, 739, 435 N.E.2d 877, 881.) Illinois courts also recognize that a hospital can be charged with direct negligence in failing to review, and in certain instances, supervise the medical care given a patient under a doctor's care within the hospital (*Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253; *Johnson v. St. Bernard Hospital* (1979), 79 Ill. App. 3d 709, 399 N.E.2d 198), or to use reasonable care in maintaining medical records (*Fox v. Cohen* (1980), 84 Ill. App. 3d 744, 406 N.E.2d 178).

 Hospitals must comply with the standards of proper care which guide institutions holding themselves out as devoted to the care and saving of human life. (*Johnson v. St. Bernard Hospital* (1979), 79 Ill. App. 3d 709, 716, 399 N.E.2d 198, 204; *Scardina v. Colletti* (1965), 63 Ill. App. 2d 481, 489, 211 N.E.2d 762, 766.) The standard to which the hospital must conform its conduct is the accepted standard of care in the medical community. (*Johnson*, 79 Ill. App. 3d at 718, 399 N.E.2d at 205.) Our supreme court, in *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253, held that hospital regulations adopted by the Illinois Department of Public Health under the Hospital Licensing Act (Ill. Rev. Stat. 1963, ch. 111½, pars. 142 through 157), accreditation standards of the American Hospital Association, and the defendant hospital's own bylaws were relevant, although not conclusive, in establishing the standard of care which the hospital owed its patient. The court reasoned that this type of evidence performed much the same function as testimonial evidence of custom and practice in the medical community. (*Darling*, 33 Ill. 2d at 332, 211 N.E.2d at 257.) Like the common-knowledge and gross-negligence exceptions, the use of hospital licensing regulations, accreditation standards, and bylaws to establish a hospital's standard of care remains one of the few judicially recognized exceptions to the general requirement of expert testimony to establish the applicable standard of care in medical malpractice cases. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 258, 381 N.E.2d 279, 283; *Chiero v. Chicago Osteopathic Hospital* (1979), 74 Ill. App. 3d 166, 173, 392 N.E.2d 203, 209.) Nonetheless, while the hospital's bylaws may be properly introduced in evidence of the applicable standard of care, the plaintiff in a medical malpractice case still has the burden of

establishing that a violation of such standards proximately caused the injury complained of. *First National Bank v. Porter* (1983), 114 Ill. App. 3d 1, 12, 448 N.E.2d 256, 264; *Eckley v. St. Therese Hospital* (1978), 62 Ill. App. 3d 299, 305-06, 379 N.E.2d 306, 311.

In their second amended complaint, plaintiffs' specific allegations against the Hospital were that it failed to "require" attending pediatricians to perform a newborn examination for hip dislocation as required by Hospital rules and procedures; "permitted" an infant to be discharged from its neonatal intensive care unit without ascertaining whether there was a "presence or an absence" of hip dislocation; permitted physicians "unskilled" in neonatal care to provide such care; and restricted the care of neonates within the hospital to a physician "uncertified in pediatrics and uncertified in *** neonatology." Plaintiffs further alleged that as a result of these negligent acts on the part of the Hospital, Patrick Rohe suffered injury and disability.

On appeal, plaintiffs concede that no expert offered an opinion as to the Hospital's standard of care or criticized its conduct relative thereto. However, they ask this court to accept portions of the Hospital's bylaws as evidence of that standard. They further contend that the Hospital's duty to create a "Maternity Service Plan," in compliance with State administrative regulations adopted pursuant to the Hospital Licensing Act, meant that provisions of this plan, incorporated into the Hospital's bylaws, established the Hospital's standard of care with respect to newborn infants. We note that the record on appeal contains no official Hospital documents other than the July 1, 1977, contract with Dr. Shivde's professional corporation and Patrick's three-page medical chart. Nor does the record include a copy of the pertinent Department of Public Health regulations governing neonatal intensive care in licensed hospitals, as set forth in chapter 77 of the Illinois Administrative Code (77 Ill. Adm. Code §250.1810 *et seq.* (1985)). Nonetheless, the record does reveal that on September 22, 1986, the Hospital produced certain internal documents, including rules and regulations relating to infant care in its nurseries in September 1981.[1] As set out in plaintiffs' "Response to Motion of the Defendant, Little Company of Mary Hospital, for Summary Judgment and Motion of the Plaintiff to Vacate the Order *** Granting Summary Judgment to the Defendant, Pinakini S. Shivde, M.D.," relevant

---

[1]Although it appears that the Hospital produced these documents nearly three years after plaintiffs filed their "Notice to Produce," specifically requesting them, on October 28, 1983, there is no evidence in the record that plaintiffs ever filed a motion to compel compliance with the request (107 Ill. 2d R. 219(a)), as directed in the trial court's February 6, 1985, order setting closing dates for discovery in this case.

portions of the Hospital's maternity service plan state as follows:

"VI
### LEVEL OF CARE (15—2.5)5
\* \* \*

3. Admission to the Neonatal Intensive Care Nursery is limited to infants needing intensive care for observed and/or anticipated problems resulting from high-risk pregnancy and/or labor \*\*\*.
\*\*\*

4. LCMH has a neonatologist on the staff who is on call twenty-four hours a day. \*\*\*
\* \* \*

\*\*\* Dr. Pinakini S. Shivde is the neonatologist on staff at LCMH \*\*\*. \*\*\*
\* \* \*

### XVIII
### MEDICAL RECORDS (15—3.8)8.
\* \* \*

2.4 (Infant Records) Report of a complete and detailed physical examination within 24 hours following birth; report of a medical examination within 24 hours of discharge, and one at least every three days during the hospital stay."

The section on medical records is also quoted in the Hospital's responsive brief on appeal.

Furthermore, plaintiffs are correct in stating that the Hospital's maternity service plan derives exclusively from regulations promulgated to administer the Hospital Licensing Act (Ill. Rev. Stat. 1981, ch. 111½, par. 142 *et seq.*). The Illinois Administrative Code, title 77, chapter I, part 250; Hospital Licensing Requirements, contains the following pertinent regulations relating to neonatal intensive care in licensed hospitals:

"Section 250.1820 Maternity and Neonatal Service Regulations (Perinatal Service)
\* \* \*

[(e)] (1) Maternity and Neonatal Service Plan. Hospitals performing maternity and newborn services must submit for the Illinois Department of Public Health's approval, a plan developed by the nursing department, medical staff, and approved by the governing authority of the hospital, for the management of the obstetric and neonatal patients. The Department will approve plans that comply with the requirements of Subpart O, Hospital Licensing Requirements.

(2) The hospital's written Maternity and Neonatal Service Plan shall be known to medical staff and nursing personnel

and more specifically to maternity and nursery personnel. * * *
* * *

Section 250.1830 General Requirements for All Maternity Departments
* * *

[(f)(5)] (C) Level III or Intensive Care:

(i) The Chief of Neonatal Pediatrics should be eligible for certification by the American Board of Pediatrics' subspecialty board of neonatal-perinatal medicine, and is responsible for care in intensive care areas. Only physicians eligible for certification in neonatal-perinatal medicine should be responsible for care of infants in the Intensive Care area, but other physicians should be encouraged to participate. The Chief should be full-time with the hospital service. There should be sufficient number of qualified or certified neonatologists to assure availability of such care at all times. * * *
* * *

[(h)] (2) Infant records. For each infant there shall be accurate, and complete medical records. The medical records shall include:
* * *

(D) Report of a complete and detailed physical examination within 24 hours following birth; report of a medical examination within 24 hours of discharge and one at least every three days during the hospital stay." 77 Ill. Adm. Code §§250.1820 (eff. April 22, 1979), 250.1830 (eff. April 22, 1980).

■■ We will assume, as plaintiffs contend, that the Hospital's standard of care with regard to written documentation of newborn examinations and the qualifications of physicians providing intensive care to newborns is sufficiently established by the Hospital's own maternity service plan and the pertinent administrative regulations under the governing statute. Nonetheless, in order to successfully overcome summary judgment in favor of the Hospital, plaintiffs must also have produced expert testimony establishing, or at least suggesting, both the Hospital's noncompliance with these policies and regulations, and that such noncompliance may have proximately caused Patrick Rohe's injuries. This plaintiffs have entirely failed to do. First, only expert testimony could have established whether Dr. Shivde's detailed "progress notes" and "discharge summary," prepared to document at least four examinations of the infant over a five-day period, were not in compliance with the applicable record-keeping standards as indicated above. Moreover, while

the law in this State is that a hospital may be liable in circumstances where it knew or should have known that a physician on its staff would ignore express hospital policy in the care and treatment of patients, the courts do not recognize "the existence of a duty on the part of the hospital's administration to insure that each of its staff physicians will always perform his duty of due care to his patient." (*Pickle v. Curns* (1982), 106 Ill. App. 3d 734, 739, 435 N.E.2d 877, 881.) Nor do plaintiffs allege, must less substantiate, that the Hospital failed to review the performance of Dr. Shivde as to her conduct in examining newborn infants or her compliance with Hospital policy in charting the findings of those examinations. In fact, they nowhere allege or substantiate that the Hospital knew or should have known of her alleged noncompliance with any Hospital policy on any occasion.

Even if we take at face value the statement in Dr. Shivde's discovery deposition that she routinely reviewed several things listed in the Hospital's admittance/discharge examination form which she did not note because she "sort of" restricted herself to the positive findings, and infer from that statement that the Hospital may have known that this was her routine practice, there is neither expert testimony nor other evidence to suggest that Dr. Shivde's failure to chart negative, or normal, findings on Patrick's chart, after conducting her required examinations, in any way contributed to Patrick's hip problems. The same reasoning applies to plaintiffs' allegations that the Hospital restricted the care of neonates to an unqualified physician, "uncertified in pediatrics and uncertified in *** neonatology." Certainly, the standards set forth in its own regulations and in the Illinois Administrative Code establish the duty of care owed to the Hospital's patients in terms of staffing the neonatal intensive care unit. However, there is unrebutted testimony that Dr. Shivde was certified in pediatrics in December 1980 and that she was studying for a Board subspecialty examination at the time of her deposition in 1982. While her deposition does not state that she was preparing for the neonatology examination, specifically, plaintiffs concede in their reply brief on appeal that Dr. Shivde was certified in neonatology by 1985. Furthermore, plaintiffs have presented no expert testimony to even suggest that Dr. Shivde was not "eligible for certification" by the American Board of Pediatrics' subspecialty board of neonatal-perinatal medicine in September 1981, or that she was not either a "qualified or certified" neonatologist at that time, or that one such neonatologist did not meet the Hospital's standard of care to the number of patients it then served. Finally, they have presented no expert testimony to establish that such deficiencies, if they existed and were known or should have been known to the Hospital, might have proxi-

mately caused Patrick's injuries. It is precisely the absence of such expert testimony which distinguishes this case from several others where appellate courts have determined that triable issues of fact existed. See, *e.g., Northern Trust Co. v. Weiss Memorial Hospital* (1986), 143 Ill. App. 3d 479, 493 N.E.2d 6 (where expert testified that a specially trained nurse, as required under the applicable standard, should have notified a physician of infant's symptoms more than six hours earlier than the nurse without special training who was left in charge of hospital's nursery, and that failure to notify a physician earlier increased risk of brain damage suffered by infant); *First National Bank v. Porter* (1983), 114 Ill. App. 3d 1, 448 N.E.2d 256 (where there was substantial testimony that hospital's chairman of obstetrics and gynecology ignored hospital's written policy relating to examination and release of women believing that they were in labor, told staff nurses to follow another policy, and failed to correct the procedure actually being followed when directly informed of the incorrect practice by another staff physician, as well as expert testimony that nurses' adherence to the incorrect procedure may have increased the likelihood of infant's mental retardation during the birth process); *Johnson v. St. Bernard Hospital* (1979), 79 Ill. App. 3d 709, 399 N.E.2d 198 (where expert testified that hospital breached its own standard of care, as established by its bylaws and by custom and practice in the community, by not using reasonable efforts to assist a staff physician to obtain a consultation with a staff orthopedic specialist when informed of the specialist's refusal to consult with the treating physician, and that patient's death was possibly attributable to medical staff's failure to detect a bone fracture).

For the above-stated reasons, we conclude that plaintiffs have failed to present any expert testimony as to the elements of breach of duty and proximate cause which would overcome the Hospital's motion for summary judgment. With regard to neither defendant have they presented a factual basis which would arguably entitle them to judgment in their favor, based on the applicable law. Accordingly, the trial court's order of April 10, 1987, denying plaintiffs' motion to vacate the previous order granting summary judgment to the Hospital, is hereby affirmed.

Affirmed.

LORENZ and MURRAY, JJ., concur.