Dr. Mario R. García Palmieri y otros, demandantes y recurridos, v. Dr. José Soler Zapata y otros, demandados y recurrentes.

*Número:* RE-93-408          *Resuelto:* 13 de febrero de 1995

*Edmee Vicenty*, abogada de los recurrentes; *Rafael Rivera Rosa*, abogado de los recurridos; *Emilio Peña Fonseca*, abogado del Dr. José L. Jiménez Vélez, Rector Interino del Recinto de Ciencias Médicas de la Universidad de Puerto Rico, quien sustituye al codemandado Dr. Francisco Hernández Oquendo.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

Nos corresponde resolver si erró el Tribunal de Primera Instancia, Sala de San Juan (Hon. Gilberto Gierbolini, hijo, Juez Superior), al concluir que eran válidas la asamblea y votación realizadas el 22 de septiembre de 1992 por unos médicos que ostentaban unos nombramientos administrativos temporeros en la Corporación del Centro Cardiovascular de Puerto Rico y del Caribe (en adelante Centro Cardiovascular), a los efectos de elegir a los miembros del Comité Ejecutivo de la Facultad Médica. *Revocamos el dictamen del tribunal de instancia* que determinó que dicha votación era válida.

I

Mediante la Ley Núm. 51 de 30 de junio de 1986,[1] fue creada la Corporación del Centro Cardiovascular de Puerto Rico y del Caribe. El 2 de octubre de 1991, la Junta de Directores del Centro Cardiovascular aprobó los Estatutos Generales para la Organización de la Facultad Médica del Centro Cardiovascular de Puerto Rico y el Caribe, el cual fue objeto de revisión el 16 de octubre de 1991. Así las cosas, el 30 de enero de 1992 fue aprobado por la Junta de Directores el Manual de Proceso para la Evaluación y Otorgamiento de Nombramientos y Privilegios a la Facultad Médica de la Corporación del Centro Cardiovascular de Puerto Rico y del Caribe, en el cual, entre otras, se establece una serie de categorías en su Facultad Médica y se determinan los privilegios que han de concederse.

El 31 de julio de 1992 se otorgó un acuerdo de filiación entre el Centro Cardiovascular y el Recinto de Ciencias Médicas de la Universidad de Puerto Rico a los efectos de

---

[1] Ley de la Corporación del Centro Cardiovascular de Puerto Rico y el Caribe, 24 L.P.R.A. sec. 343 *et seq.*

que los servicios de medicina y de cirugía cardiovascular, que la Facultad del Recinto había estado ofreciendo en las Unidades de Cirugía e Intensivo Cardiovascular de la Administración de Servicios Médicos, serían realizados en las nuevas facilidades del Centro Cardiovascular. Se reconoció en dicho acuerdo que los nombramientos otorgados y la concesión de privilegios se concederían según la reglamentación y la política institucional establecida por la Junta de Directores del Centro Cardiovascular. Según se hizo constar en dicho acuerdo, el Centro Cardiovascular comenzaría a prestar los servicios médico-hospitalarios el 3 de agosto de 1992.

Mediante una Carta de 31 de agosto de 1992, la Decana del Recinto de Ciencias Médicas, Dra. Nilda Candelario, sometió al Director Médico del Centro Cardiovascular, Dr. Félix Cortés, una lista de los facultativos disponibles de la Facultad de la Escuela de Medicina, para solicitar que se le concediesen unos privilegios temporeros. Por medio de Cartas de 31 de agosto y de 4 de septiembre de 1992, el Director Médico del Centro Cardiovascular concedió unos nombramientos administrativos temporeros de noventa (90) días a los médicos disponibles de la Facultad de la Escuela de Medicina.

Así las cosas, mediante Carta de 17 de septiembre de 1992, el Director Médico del Centro Cardiovascular notificó a los médicos de una reunión que habría de celebrarse el 22 de septiembre de 1992 a los fines de discutir la organización de la Facultad Médica.

Llegada dicha fecha, se celebró una asamblea en la cual los médicos del Centro Cardiovascular eligieron a los miembros de su Comité Ejecutivo. Fueron elegidos el Dr. Mario R. García Palmieri como Presidente, el Dr. Carlos E. Girod como secretario-tesorero y los Dres. Rubén Díaz, José E. López y Rafael Cox como vocales. A ese momento, todos los médicos ostentaban sólo nombramientos administrativos temporeros.

Dicho proceso de elección no fue reconocido por la Junta de Directores del Centro Cardiovascular por razón de que los médicos, que habían participado en ésta, no eran miembros de la Facultad Médica de la institución hospitalaria, ya que ostentaban únicamente unos nombramientos administrativos temporeros, por lo cual no se les había concedido privilegios. Como consecuencia, la Junta determinó que no eran miembros de la facultad activa y, por lo tanto, no tenían derecho al voto en los asuntos de la Facultad Médica. A esos efectos, la Junta de Directores emitió la Certificación Núm. 11 de 29 de septiembre de 1992, la cual se ratificó mediante la Certificación Núm. 14 de 23 de noviembre de 1992.

En atención a lo anterior, se convocó para una nueva reunión que habría de celebrarse *el 7 de diciembre de 1992, a los efectos de que los médicos que ya ostentaban privilegios a esta fecha*, participaran en la elección del Comité Ejecutivo de la Facultad. Llegada esa fecha, varios médicos solicitaron ante el Tribunal Superior la expedición de una orden de *injunction* provisional contra los miembros de la Junta de Directores del Centro Cardiovascular, así como contra dicha corporación, a los efectos de que se abstuvieran de celebrar la asamblea pautada para esa fecha. El Tribunal Superior no expidió el entredicho provisional, *por lo que se celebró la asamblea con la participación de los médicos que ostentaban privilegios y, por lo tanto, miembros de la Facultad Activa*. Efectuada la votación, fueron elegidos el Dr. José Martínez Toro como Presidente, el Dr. Etienne Otaño como secretario-tesorero y los Dres. José E. López, Carlos Girod y Rubén Díaz como vocales.

Luego de ello, la petición de *injunction* fue enmendada a los fines de incluir a los médicos elegidos en la Asamblea de 7 de diciembre de 1992, con excepción de los Dres. José E. López y Carlos Girod, quienes figuran como demandantes en la petición. Así las cosas, las partes estipularon los hechos y sometieron sendos memorandos de derecho en apoyo

a sus respectivas posiciones. Considerados los memorandos de las partes, así como los hechos estipulados y la prueba documental sometida, el tribunal de instancia emitió una sentencia, en la cual resolvió que la elección habida el 22 de septiembre de 1992 era válida, al concluir que los médicos que poseían los nombramientos temporeros podían votar a los fines de seleccionar un Comité Ejecutivo de la Facultad Médica del Centro Cardiovascular, por ser dichos médicos miembros de la Facultad. Asimismo concluyó que no había reglamento de la Facultad Médica para la fecha de la Asamblea; esto es, el 22 de septiembre de 1992, puesto que se había anulado la aprobación del reglamento de la Facultad que hicieron el Director Médico y los tres (3) directores interinos del departamento del Centro Cardiovascular. Por último, nombró una comisión para que, entre otras cosas, resolviera cualquier duda en cuanto a la composición de la Facultad Activa.

No conformes, acuden ante nos los codemandados Dres. José Martínez Toro, Etienne Otaño y Rubén Díaz, mediante solicitud de revisión, en la cual solicitan la revocación de la sentencia recurrida. Básicamente alegan que el tribunal de instancia erró al no desestimar la petición, por tratarse de una solicitud para impedir que la Junta de Directores hiciera uso de las facultades que le confiere la ley. Éstas no han sido impugnadas por ser inconstitucionales; al reactivar motu propio los procedimientos del caso luego de cuatro (4) meses de inactividad; al hacer caso omiso a los hechos estipulados por las partes, y al hacer referencia a unos hechos sobre los cuales no se presentó prueba alguna.(²) Al igual, plantean que el tribunal de instancia erró al determinar que los médicos, que participaron en la votación de 22 de septiembre de 1992, constituían una facultad autónoma y al nombrar una comisión con la facultad para determinar y resolver dudas en cuanto a la com-

_____
(²) Dichos errores no serán discutidos por ello ser innecesario dado al resultado llegado en la discusión de los demás errores planteados.

posición de la facultad activa. Además, en la discusión de los señalamientos de error plantean que la doctrina de los actos propios aplica, por lo que, luego de haber participado los demandantes en la segunda asamblea e, incluso, haberse nominado para puestos, no pueden proseguir con la petición de *injunction* por estar en contra de sus propios actos.(³)

Concedimos a los demandantes recurridos —Dr. Mario R. García Palmieri y otros— un término para que mostraran causa por la cual no debamos revocar la sentencia recurrida y sostener las decisiones de la Junta de Directores del Centro Cardiovascular, a saber: (1) la cual declaró que la elección de los oficiales de la Facultad Médica, que se llevó a cabo el 22 de septiembre de 1992, es nula, y (2) que la elección de 7 de diciembre de 1992 es válida, conforme a la autorización expresa que le confiere la Ley Núm. 51, *supra,* en particular los incisos (d), (f), (j) y (l) del Art. 3 de dicha ley, 24 L.P.R.A. sec. 3436. En auxilio de nuestra jurisdicción, paralizamos los procedimientos en el foro de instancia, incluyendo su dictamen que creaba una Comisión, paralizamos la celebración de nuevas elecciones pautadas para el 25 de agosto de 1992 y ordenamos que se mantuviera en sus funciones el Comité Ejecutivo según electo el 7 de diciembre de 1992.

Ante nos comparecieron en escrito conjunto como opositores los demandantes recurridos y el Dr. José L. Jiménez Vélez, Rector Interino del Recinto de Ciencias Médicas, en sustitución del Dr. Francisco Hernández Oquendo.(⁴) Éstos alegan que, por no haber recurrido ante nos el Centro Cardiovascular, los codemandados recurrentes no tienen legi-

---

(³) Ello resulta incorrecto, ya que se hizo constar en la minuta de la asamblea que se continuaría con la petición presentada en el Tribunal Superior al no haber objeción alguna sobre ello, por lo que no renunciaron a continuar con su acción legal.

(⁴) A pesar de que el Rector del Recinto de Ciencias Médicas figura como parte demandada, por ser miembro de la Junta de Directores del Centro Cardiovascular desde los inicios de la controversia, éste asumió la misma posición que los demandantes recurridos; esto es, que la elección celebrada el 22 de septiembre de 1992 es válida.

timación activa para reclamar derechos ajenos. Asimismo, alegan que la institución hospitalaria, a la fecha de la primera asamblea, ya había ejercido su facultad de conceder nombramientos y privilegios, por lo que no podía intervenir ni anular los mecanismos adoptados por los facultativos, para organizarse internamente entre sí y elegir a sus representantes, por ser la Facultad Médica autónoma e independiente. Alegan que no existe autogobierno alguno en una Facultad Médica que no posee siquiera autoridad suficiente para determinar quiénes serán sus representantes.

Habiendo comparecido las partes, estamos en posición de resolver. De un examen minucioso de los escritos de las partes, las estipulaciones de hechos y la prueba documental sometida ante el tribunal de instancia, concluimos que aquí no se cuestiona el poder de la Facultad Médica para elegir sus representantes, según argumentan los recurridos, sino que la controversia versa sobre quienes componen dicha Facultad Médica y quienes ostentan el derecho al voto. Asimismo, la controversia gira en cuanto a la autoridad de la Junta de Directores para establecer unos parámetros y unas definiciones que regulen la organización de la Facultad Médica. Sobre dichos aspectos concentraremos nuestro análisis.

## II

Cuestionan los recurridos la legitimación activa de los codemandados recurrentes para acudir ante nos mediante una solicitud de revisión a reclamar derechos ajenos. No le asiste la razón a los recurridos. No se trata de derechos ajenos sino que, al haber sido elegidos los codemandados para ocupar unas posiciones en el Comité Ejecutivo de la Facultad Médica en la asamblea celebrada el 7 de diciembre de 1992 y al haberse decretado como válida la primera asamblea y resultante elección celebrada el 22 de septiem-

bre de 1992, quedan los codemandados recurrentes privados de ocupar los puestos para los cuales fueron seleccionados. Todo ello, en unión al hecho de que se establece un precedente que, a largo plazo, tiene la consecuencia de que se le reconocen unos derechos a los médicos con *nombramientos administrativos temporeros*, en contra de los reglamentos y las normas establecidos y en detrimento de los médicos que posean nombramientos y privilegios autorizados por la institución hospitalaria. Aclarado lo anterior, discutamos los méritos del caso.

## III

Mediante la Ley Núm. 51, *supra*, fue creada la Corporación del Centro Cardiovascular de Puerto Rico y del Caribe, con el propósito de proveer al Pueblo de Puerto Rico, el Caribe y América, los tratamientos y equipos más avanzados para atender sus problemas cardiovasculares; eliminar o mitigar las dolencias de los pacientes cardiovasculares; así como fomentar la enseñanza, el estudio, la investigación y el desarrollo intelectual de los profesionales de la salud en esta área altamente especializada de la medicina. Véase Exposición de Motivos de la referida ley, 1986 Leyes de Puerto Rico 175. Se trata de una corporación pública que funciona como una entidad independiente y separada de cualquier otra agencia o instrumentalidad del Gobierno del Estado Libre Asociado de Puerto Rico dirigida por una Junta de Directores. Véase Art. 2 de la Ley Núm. 51, *supra*, 24 L.P.R.A. sec. 343a. La Corporación, por medio de su Junta de Directores, según disposición expresa del Art. 3 de esta ley, *supra*, tiene, entre otros, los poderes siguientes: "(d) *Establecer e implantar mecanismos apropiados para la evaluación de credenciales y para la aprobación, suspensión o revocación de los privilegios para ejercer en las facilidades de la Corporación.* ... (f) Estable-

cer su propia estructura administrativa. ... (j) Formular, adoptar, enmendar y derogar reglas y reglamentos necesarios para su funcionamiento". (Énfasis suplido.)

■■■■ La autoridad de la Junta de Directores de los hospitales para establecer las diversas categorías y privilegios de su Facultad Médica, así como su concesión, obedece a poderosas razones de política pública. Existe un alto interés público en la protección de la salud; en proveer unos servicios hospitalarios de calidad y eficiencia a nuestra población, y, por consiguiente, una efectiva administración que las haga viables. No estamos ante corporaciones comunes no dedicadas a prestar servicios hospitalarios, sino que se trata de entidades hospitalarias altamente reglamentadas tanto a nivel local como federal, exigiéndose incluso una licencia para operar como tal.

Más aún, en el caso que nos ocupa se trata de una corporación creada por ley, en el área de la salud pública y sumamente especializada en la prestación de sus servicios médico-hospitalarios.

A estos efectos, véase *Johnson v. Misericordia Community Hospital*, 294 N.W.2d 501, 508 (1980), en el cual se señaló que "[t]he standards of hospital accreditation, the state licensing regulations, and the respondent's bylaws demonstrate that the medical profession and other responsible authorities regard it as both desirable and feasible that a hospital assume certain responsibilities for the care of the patient". (Citas omitidas). Véase, además, *Beeck v. Tucson General Hospital*, 500 P.2d 1153, 1157 (Ariz.1972); *Darling v. Charleston Community Memorial Hospital*, 33 Ill.2d 326, 211 N.E.2d 253 (1965).

Asimismo, en IIA *Hospital Law Manual*, Governing Board, Sec. 3.1, págs. 25–26 (1990), se señala que "[t]he Joint Commission addresses general governing board responsibility as follows: 'An organized governing body, or designated persons so functioning, is responsible for establis-

hing policy, maintaining quality patient care, and providing for institutional management and planning' ".([5])

De igual manera, véase IIB *Hospital Law Manual*, Medical Staff, Sec. 3, pág. 27 (1990), el cual se señala que "Hospitals have both *the right and the duty* to establish reasonable requirements for admission to the medical staff. It is important that the requirements bear a reasonable relationship to the provision of quality patient care. This necessitates that hospitals provide in their bylaws, rules and regulations for adequate professional screening of staff applicants". (Énfasis suplido.) Más adelante, en la Sec. 5.2 se advierte:

> The governing body of a hospital has a duty to see that the medical care provided in the institution is of suitable quality, and may be found liable for failure to exercise its authority appropriately to have each medical staff member's performance reviewed for assessment of competence, or to enforce standards of competence against individual staff members in the interest of protecting the well-being of the institution's patients. ... Authority follows responsibility, and hospitals have long been held to have abroad authority to impose conditions on medical practice in the hospital, in order to maintain the quality of care, including the power to remove practitioners, or curtail their privileges. Íd., pág. 64.

■ De todo lo anterior surge con meridiana claridad la autoridad de la Junta de Directores para establecer las diversas categorías y los privilegios de su Facultad Médica. Ello, además, encuentra apoyo en lo dispuesto en el Code of Federal Regulation, 42 C.F.R. sec. 488.22(b)(1) (1992), a los efectos de que "[t]he medical staff must be organized in a manner approved by the governing body". En adición, en nota al calce con relación a la norma MS.1.1 del *Accreditation Manual for Hospitals* (1991) se indica que "clinical privileges are based on criteria *established by the hospital*". (Énfasis suplido.) Asimismo, la norma MS.3.5

---

([5]) Citando a *Joint Commission, Accreditation Manual for Hospitals*, Governing Body, Standard GB.1 (1990).

dispone que "[t]here is an executive committee of the medical staff whose members are selected by the medical staff or appointed *in accordance with governing body bylaws*". (Énfasis suplido.)[6]

■ Robert D. Miller, en *Problems in Hospital Law*, 5ta ed., Florida, Ed. Aspen Pub., 1986, Cap. 7, pág. 117, señala:

> Before a physician may practice in a hospital, the physician must obtain an appointment to the medical staff and be granted clinical privileges by the hospital governing board. ... The governing board has the responsibility to exercise discretion in deciding whether to grant an appointment *and what scope* of clinical privileges to grant. (Énfasis suplido.)

Asimismo, en IIA *Hospital Law Manual*, Governing Board, Sec. 3.7, pág. 35 (1990), se señala:

> The governing board has the *ultimate responsibility* for the selection of the hospital medical staff. Acting on the advice and recommendations of the medical staff, the governing board must see that all physicians who are granted medical staff membership and clinical privileges are fully qualified for them. (Énfasis suplido.)

■ La autoridad de la Junta de Directores para establecer las diversas categorías y los privilegios de su Facultad Médica, así como su concesión, alcanza tal importancia que el hospital sería responsable de encontrarse que no ejerció dicho deber apropiadamente. A dichos efectos, véase lo expresado por Miller:

> Hospitals have been found liable for the actions of physicians when they failed to evaluate the physicians properly prior to

---

[6] Véase, además, lo señalado por D.D. Fraiche en D.G. Langsley y M.M. Singer, *Hospital Privileges and Specialty Medicine*, Illinois, Ed. American Board of Medical Specialties, 1986, pág. 69, en cuanto a que "[t]he governing body bylaws should reference medical staff membership and delineation of clinical privileges". Por último, véase IIB *Hospital Law Manual*, Medical Staff, Sec. 3, pág. 27 (1990), a los efectos de que "Hospitals make rules relative to the criteria and procedures used in making initial appointment to the medical staff ... Hospitals have both the right and the duty to establish reasonable requirements for admission to the medical staff".

the medical staff appointment or failed to monitor physician performance properly after appointment. Miller, *op. cit.*, pág. 118.

## IV

■ Dentro del ejercicio de sus facultades, La Junta de Directores del Centro Cardiovascular promulgó el Manual de Proceso para la Evaluación y Otorgamiento de Nombramientos y Privilegios a la Facultad Médica de la Corporación del Centro Cardiovascular de Puerto Rico y del Caribe, págs. 5–7,[7] aprobado el *30 de enero de 1992*, para establecer una serie de categorías en su Facultad Médica, a saber:

A. Facultad Activa

Se considerará miembro de la Facultad Activa aquel médico que regularmente admite o evalúa pacientes, ya sea los que acuden en estado de emergencia o los que le refieren a manera de consultas otros médicos. ... Un facultativo activo no debe estar nombrado dentro de un departamento específico, debe asistir a las reuniones periódicas de la facultad, en las cuales tendrá derecho al voto, y debe servir en los comités de Facultad.

B. Facultad de Cortesía

Se considerará miembro de la Facultad de Cortesía aquel médico que está siendo considerado para su nombramiento a la Facultad Activa del Hospital y que cumple con los requisitos mínimos para el nombramiento. Un facultativo de cortesía debe estar adscrito a un departamento específico.

Para que un facultativo de cortesía pueda ser considerado para admisión a la Facultad Activa, deberá admitir y/o atender

---

[7] Alegan los demandantes recurridos que, de haber una clasificación aplicable, ésta sería la contenida en los *bylaws* de la Facultad Médica. Con relación a ello, basta con señalar que, para que entren en vigor los referidos *bylaws*, es necesario que la Facultad Médica los adopte. Resulta entonces que los *bylaws* no aplican ya que no podrán ser adoptados a falta de una Facultad Médica debidamente constituida. Ello es así, debido a que para el 22 de septiembre de 1992 sólo había *nombramientos temporeros*, los cuales no constituyen parte de la *Facultad Activa*, quienes son los únicos con derecho al voto.

regularmente ... pacientes, ya sea los que acuden en estado de emergencia o los que le refieren a manera de consultas otros médicos. Deberá cumplir un mínimo de un año como facultativo de cortesía y permanecer a un Comité de la Facultad Médica, según lo disponga el Presidente de la Facultad o el Director Médico.

Los miembros de cortesía no serán elegibles para jefaturas de departamentos o secciones, pero deberán asistir a las reuniones de departamento o de facultad.

C.   Facultad de Consulta

Se considerará miembro de la Facultad de Consulta, aquel médico de reconocida habilidad profesional o de reputación extraordinaria, que no pertenece a alguna otra de las membresías, pero que ha manifestado su interés en pertenecer a la Facultad de Consulta.

La Facultad de Consulta no admite pacientes regularmente y su nombramiento se extiende como un gesto de reconocimiento por su prominencia en la comunidad médica.

El facultativo de consulta no podrá ejercer jefaturas de departamentos ni comités y no se le asignarán responsabilidades relacionadas con el cuidado de pacientes.

D.   Facultad de Profesionales de la Salud

Se considerará Facultad de Profesionales de la Salud aquellos recursos profesionales, no médicos, cuyos servicios son esenciales para ofrecer un cuidado completo y de excelencia a los pacientes, tales como terapistas, psicólogos clínicos, y otros.

■   Así, la controversia en este caso se reduce a determinar si, al *22 de septiembre de 1992*, los médicos demandantes recurridos eran miembros de *la Facultad Activa*, pues según el citado Manual de Proceso para la Evaluación y Otorgamiento de Privilegios a la Facultad Médica de la Corporación del Centro Cardiovascular de Puerto Rico y del Caribe, *éstos son los únicos que poseen derecho al voto y derecho a ocupar un puesto en el Comité Ejecutivo.* De un examen de las estipulaciones de las partes, así como de la prueba documental sometida ante el tribunal de instancia, podemos notar que los demandantes recurridos *poseían*

*meramente nombramientos temporeros*,[8] por lo que no formaban parte de la Facultad Activa. Veamos.

En una Carta de 31 de agosto de 1992 de la Decana de la Escuela de Medicina del Recinto de Ciencias Médicas, Universidad de Puerto Rico, Dra. Nilda Candelario, dirigida al Director Médico del Centro Cardiovascular, Dr. Félix Cortés, surge con claridad que ésta sometió una lista de los facultativos disponibles de la facultad de la Escuela de Medicina, y que se les orientó para que solicitasen los privilegios del Centro Cardiovascular, así como que se solicitaba *que se les concediese unos privilegios temporeros.* Asimismo, mediante Cartas de 31 de agosto y de 4 de septiembre de 1992, el Dr. Félix Cortés notificó a los facultativos que, a tono con su solicitud, se le extendía un nombramiento *administrativo temporero* de noventa (90) días. Véase, además, la Estipulación de Hechos Núm. 8 a los efectos de que "[a] todos los facultativos [m]édicos citados se les había extendido privilegios, los cuales el Centro Cardiovascular denominaba '*temporeros*' por un término de noventa (90) días, hasta que la Junta de Directores del Centro tomara una decisión final". (Énfasis suplido.) Moción informativa de 11 de mayo de 1993, pág. 3. Además, de una lista presentada ante el tribunal de instancia cuyo contenido indica la fecha cuando se concedió el nombramiento administrativo temporero, así como la fecha cuando finalmente se concedieron los privilegios correspondientes a la categoría involucrada en cada caso, surge que al momento de la primera asamblea, esto es, 22 de septiembre de 1992, *ningún facultativo tenía privilegios concedidos para la Facultad Activa,* quienes son los únicos con derecho al voto y ostentaban meramente nombramientos temporeros.

---

[8] En IIB *Hospital Law Manual,* supra, Sec. 4.2, pág. 56, se definen los privilegios temporeros como que "may be granted applicants for membership on the medical staff whose appointment to one of those categories has not yet been considered by the governing body. Temporary privileges in this case are granted for such period as is necessary for the governing body to act on the recommendation of the medical staff. ... Temporary medical staff privileges also may be granted for a limited period to practitioners who have not applied for medical staff memberships".

■ De todo lo antes expuesto, surge con claridad la improcedencia de la asamblea celebrada el 22 de septiembre de 1992, pues al no haberse otorgado los nombramientos para la Facultad Activa, no había médico alguno con derecho al voto. A dicha fecha, no había Facultad Activa constituida, pues la Junta de Directores no había evaluado los expedientes de los médicos para poder extenderles nombramientos como miembros de la Facultad Activa. Recordemos que según correctamente se señala en la parte introductoria de los Estatutos Generales para la Organización de la Facultad Médica del Centro Cardiovascular de Puerto Rico y del Caribe, pág. 2, aprobado el *2 de octubre de 1991* y revisado el 16 de octubre de 1991: "La facultad de la Junta de Directores, para otorgar privilegios o nombramientos es indelegable ya que es dicho cuerpo quien tiene la responsabilidad por la calidad, eficiencia y aceptación de los servicios médicos-profesionales que se ofrecen en la institución, así como por la adecuacidad de los servicios que ofrecen sus médicos y demás personal del hospital."

Por lo tanto, a tenor con todo lo anterior, *resulta nula la Asamblea celebrada el 22 de septiembre de 1992 y, en consecuecia, los resultados de la elección allí efectuada. La elección celebrada el 7 de diciembre de 1992 es válida.*

*Se emitirá la sentencia correspondiente.*

Los Jueces Asociados Señores Negrón García y Rebollo López, y la Juez Asociada Señora Naveira de Rodón no intervinieron.